IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| TANNER W. ROTH; JON W. SMITHLEY; LOGAN M. PRIEBE; VICTORIA S. ROBERTS; TIMOTHY C. BEXTEN; ZACHARY R. BRAUM; ARMAND G. FONDREN II; NATHAN P. GAVIC; BRENNAN L. BARLOW; MICHAEL T. EDWARDS; MATTHEW J. CASCARINO; MATTHEW C. DOWNING; KEVIN DUNBAR; CAMERON M. GRIM; AARON F. KARPISEK; IAN C. MCGEE; EVAN MCMILLAN; ZACHARY MORLEY; MATTHEW L. NELSON; BRYAN STIGALL; KYNAN VALENCIA; MORGAN T. VIAR; DANIEL VERA PONCE; ADAM R. CASSIDY; TRISTAN M. FRIES; and AIRMEN 1-11, | **8:22CV3038** |
| Plaintiffs, | |
| vs. | **MEMORANDUM AND ORDER REGARDING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| LLOYD J. AUSTIN III, in his official capacity as United States Secretary of Defense;  UNITED STATES DEPARTMENT OF DEFENSE; FRANK KENDALL III, in his official capacity as United States Secretary of the Air Force; ROBERT I. MILLER, in his official capacity as Surgeon General of the united States Air Force; MICHAEL A. LOH, in his official capacity as the Director of the Air National Guard; DAVID A. WEISHAAR, in his official capacity as Adjutant General of the Kansas National Guard; and DARYL L. BOHAC, in his official capacity as Adjutant General of the Nebraska National Guard, | |
| Defendants. | |

1

In this case, thirty-six members of the United States Air Force (active duty), United States Air Force Reserve, or the Air National Guard have filed suit objecting to the requirement originating from the President of the United States, as adopted by the United States Air Force, that all Air Force Personnel be vaccinated for the COVID-19 virus. Plaintiffs claim that forcing them to be subjected to the available COVID-19 vaccines violates their rights under the Religious Freedom Restoration Act (RFRA), 42 U.S.C. § 2000bb *et seq*., and the Free Exercise of Religion Clause of the First Amendment to the United States Constitution. This matter is now before the Court on Plaintiffs' March 18, 2022, Motion for Preliminary Injunction to enjoin application of the Air Force's COVID-19 vaccination mandate to service members on a nationwide basis. Filing 20. The Court held a hearing on Plaintiffs' Motion for Preliminary Injunction on May 9, 2022.

Plaintiffs object to receiving the COVID-19 vaccination for a variety of religious reasons. One objection made by several airmen is that part of the science giving rise to approved COVID-19 vaccines involved use of research derived from aborted fetal cell tissue that was developed decades ago. Certain major religions of the world have long strenuously objected to the use of such research in medicine. However, having lost that battle in significant regard over the decades, many of those same religions have concluded that the remote impact of what they deem to be religiously or ethically objectionable research utilized for the vaccines does not support refusal to take the vaccines on religious grounds today.

In the motion now facing the Court, the Court is not charged with deciding whether Plaintiffs' religious objections are legitimate or sincerely held. Indeed, the Air Force has not challenged at this point the veracity, legitimacy, or sincerity of Plaintiffs' religious objections. Instead, Defendants take the legal position that the Air Force has the ability under applicable law

to take disciplinary action against the airmen for refusing to follow the orders they have received to get the vaccine.

With the evidence provided to the Court in this case, there can be no serious dispute that the available COVID-19 vaccines have dramatically reduced the death toll from COVID-19 in the United States and the world. Further, the data available illustrates that those who have refused to get vaccinated have necessarily had a greater chance to get and spread the virus. Indeed, science shows that those who are unvaccinated have had a dramatically higher likelihood of serious illness or death.

Numerous courts have addressed whether vaccination mandates by branches of the military should be enjoined pending disposition of service members' underlying lawsuits on the merits of their religion-based claims. Most recently, on March 25, 2022—only one week after the motion for preliminary injunction was filed in this case—the United States Supreme Court partially stayed a preliminary injunction entered by the federal courts involving the United States Navy. The injunction issued in the case involving the U.S. Navy was materially similar to the injunction requested by the Plaintiffs in this case. In that one-paragraph decision, the Supreme Court stayed the injunction finding that there should be no limit on the U.S. Navy "considering [certain Navy Seals'] vaccination status in making deployment, assignment, and other operational decisions." *Austin v. U. S. Navy Seals 1-26*, 142 S. Ct. 1301 (2022). In other words, the Supreme Court lifted the district court's injunction in part, concluding that the applicable law does not prevent the Navy from making deployment, assignment, and other operational decisions based on vaccination status.

In concurring with the decision to stay the injunction and allowing consideration of COVID-19 vaccination status in making deployment, assignment, and other operational decisions, Justice Kavanaugh stated:

3

> In this case, the District Court, while no doubt well-intentioned, in effect inserted itself into the Navy's chain of command, overriding military commanders' professional military judgments. The Court relied on the Religious Freedom Restoration Act. *See* 42 U.S.C. § 2000bb−1(b). But even accepting that RFRA applies in this particular military context, RFRA does not justify judicial intrusion into military affairs in this case. That is because the Navy has an extraordinarily compelling interest in maintaining strategic and operational control over the assignment and deployment of all Special Warfare personnel—including control over decisions about military readiness. And no less restrictive means would satisfy that interest in this context.

*U. S. Navy Seals 1-26*, 142 S. Ct. at 1302 (Kavanaugh, J., concurring). Neither the Supreme Court's decision nor Justice Kavanaugh's concurrence was the final word on this matter. Federal courts will continue to grapple with the difficult issues involved.

With the recent limited guidance of the United States Supreme Court on the issues this Court is facing, along with this Court's detailed review of the record and evidence presented, the Court concludes the Plaintiffs' March 18, 2022, Motion for Preliminary Injunction should be denied. The Court concludes, at least at this preliminary stage, that the Air Force has demonstrated it has a compelling interest in the health and readiness of its forces, including individual service members like Plaintiffs. The Court also concludes that the Air Force's COVID-19 vaccination mandate is the least restrictive means of furthering that compelling interest, as to both the Air Force generally and as to individual Plaintiffs in particular. The Air Force has demonstrated that its process for consideration of religious exemptions was not simply "theater" or "a sham," but was a process that adhered to the requirements of the law, most specifically RFRA. These conclusions mean that Plaintiffs do not have sufficient likelihood of success on the merits of either their RFRA claim or their Free Exercise of Religion claim to warrant issuance of a preliminary injunction.

4

## I.  INTRODUCTION

### A.  Factual Background

The Court will not lay out all the circumstances of the COVID-19 pandemic or all the steps governmental entities took in response. Instead, the Court will take up the story at the point where the Air Force's COVID-19 vaccination mandate was issued, even though that factual background has also been addressed in prior decisions. *See Doster v. Kendall*, No. 1:22-CV-84, 2022 WL 982299, at *2–*3 (S.D. Ohio Mar. 31, 2022); *Poffenbarger v. Kendall*, No. 3:22-CV-1, 2022 WL 594810, at *2–*3 (S.D. Ohio Feb. 28, 2022); *Air Force Officer v. Austin*, No. 5:22-CV-00009-TES, 2022 WL 468799, at *2 (M.D. Ga. Feb. 15, 2022). This factual background continues with summaries of the exemption review process and the disciplinary process for service members who refuse vaccination without an exemption. Many additional findings of fact, however, including findings related to the Air Force's applications of its COVID-19 vaccination mandate, are set out in the Court's analysis in Section III, below.[1]

### 1.  The Air Force's Vaccination Mandate

On September 3, 2021, Defendant Frank Kendall III, the Secretary of the Air Force, issued a Memorandum. Hrg. Ex. 147,[2] Filing 1-1 at 5; https://perma.cc/6E2W-3EQM.[3] Secretary Kendall directed that, "[u]nless exempted, Active Duty Airmen and Guardians will be fully vaccinated

---

[1] Findings of fact in a ruling on a motion for a preliminary injunction are necessarily "preliminary." *See U.S. Sec. & Exch. Comm'n v. Zahareas*, 272 F.3d 1102, 1105 (8th Cir. 2001) ("[W]e have long held that 'findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding.'" (quoting *Patterson v. Masem*, 774 F.2d 251, 254 (8th Cir. 1985)); *Campaign for Fam. Farms v. Glickman*, 200 F.3d 1180, 1186 (8th Cir. 2000) ("[T]he district court's findings of fact and conclusions of law on an application for a preliminary injunction are 'tentative and provisional, in the sense that different findings . . . might be warranted after a trial on the merits.'" (quoting *Independent Fed. of Flight Attendants v. Trans World Airlines, Inc*., 655 F.2d 155, 159 (8th Cir. 1981), and also citing *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981)). Thus, no finding here is final even for purposes of this litigation.

[2] Plaintiffs' exhibits for the preliminary injunction hearing were numbered 1 through 33. Defendants' exhibits were numbered 100 through 149. Wherever possible, on first citation, the Court has included a citation to a docket filing and/or a public website where a hearing exhibit can also be found.

[3] Secretary Kendall's mandate was pursuant to the August 24, 2021, mandate from Defendant Lloyd Austin III, the Secretary of Defense. Hrg. Ex. 146, Filing 1-1 at 2; *see also* https://perma.cc/N759-S758.

[with a COVID-19 vaccine] by 2 November 2021." Hrg. Ex. 147, Filing 1-1 at 5. He also stated

that "[u]nless exempted, Ready Reserve, to include National Guard, Airmen and Guardians will

be fully vaccinated by 2 December 2021." Hrg. Ex. 147, Filing 1-1 at 5. Secretary Kendall's

Memorandum identified the COVID-19 vaccines that would satisfy the mandatory vaccine

requirement, as follows:

> Only COVID-19 vaccines that receive full licensure from the Food and
> Drug Administration (FDA) will be utilized for mandatory vaccinations unless a
> military member volunteers to receive a vaccine that has obtained U.S. Food and
> Drug Administration Emergency Use Authorization or is included in the World
> Health Organization's Emergency Use Listing.

Hrg. Ex. 147, Filing 1-1 at 5. The Memorandum expressly stated, "Individuals with previous

COVID-19 infection or positive serology are not considered fully vaccinated and are not exempt."

Hrg. Ex. 147, Filing 1-1 at 5.[4]

Secretary Kendall's Memorandum then addressed disciplinary actions for noncompliance,

as follows:

> Pursuant to my authority under Article 22 of the Uniform Code of Military
> Justice and Rules for Courts-Martial 306, 401, and 601, I hereby withhold initial
> disposition authority from all commanders within the Department of the Air Force
> who do not possess at least special court-martial convening authority and who are
> not in the grade of O-6 with respect to any alleged offense that constitutes refusal
> or failure to obtain the COVID-19 vaccine. Commanders are advised to consult
> with their servicing staff judge advocate for further guidance.

Hrg. Ex. 147, Filing 1-1 at 5. Thus, the rules for normal disciplinary procedures were modified for

refusals or failures to comply with the Air Force's COVID-19 vaccination mandate.

On September 24, 2021, Kathleen Hicks, Deputy Secretary of Defense, issued a

Memorandum concerning travel and meetings. Hrg. Ex. 148, Filing 62-10. Pursuant to the

Memorandum, fully vaccinated individuals were not restricted from domestic or international

---

[4] This statement is consistent with Secretary Austin's mandate. Hrg. Ex. 146, Filing 1-1 at 2.

official travel. In contrast, "[i]ndividuals who are not fully vaccinated or who decline to provide information about their vaccination status, are limited to mission-critical official travel, both domestic and international." Hrg. Ex. 148, Filing 62-10. Deputy Secretary Hicks's Memorandum stated, "'Mission-critical' will be determined by the traveler's DoD or Office of the Secretary of Defense (OSD) Component head [or delegate]." Hrg. Ex. 148, Filing 62-10. The Court agrees with Defendants that this part of Deputy Secretary Hicks's Memorandum prevents unvaccinated service members, with or without an exemption, from traveling to attend training, unless their participation is deemed "mission-critical."

As to in-person meetings, Deputy Secretary Hicks's Memorandum provided, among other requirements, "In-person attendees who are not fully vaccinated or who decline to provide information about their vaccination status, may not attend the meeting if they do not show the meeting organizer proof of a negative [FDA]-approved COVID-19 test completed no earlier than 72 hours prior to the meeting and at least weekly if the meeting is greater than 1 week in duration." Hrg. Ex. 148, Filing 62-10. She added, "Meetings do not include military training and exercise events conducted by the Military Departments." Hrg. Ex. 148, Filing 62-10.

   2.  *The Exemption Review Process*

Secretary Austin temporarily exempted service members who "are actively participating in COVID-19 clinical trials" from the military's COVID-19 vaccination mandate. Hrg. Ex. 146 at 1, Filing 1-1 at 2. However, there is no evidence that any service member in the Air Force is presently participating in any trials. Hrg. Ex. 103 at 11, Filing 38-3 at 11. Thus, the Court will focus on other exemptions.

The primary source of evidence that the Air Force provides regarding its procedures for handling a religious exemption request[5] is the declaration of Air Force Staff Chaplain Major Matthew J. Streett. Hrg. Ex. 112, Filing 38-12. Maj. Streett is one of the chaplain representatives on the Headquarters Air Force Religious Resolution Team advising the Air Force Surgeon General on religious accommodation appeals for vaccination exemption requests. Hrg. Ex. 112 at 1, Filing 38-12 at 1. Maj. Streett explains that the "approval authority" for an RAR from an immunization is the Major Command (MAJCOM), Field Command (FIELDCOM), Direct Reporting Unit (DRU), or Field Operating Agency (FOA) commander over the service member. Hrg. Ex. 112 at 2, Filing 38-12 at 2. There are several steps before any RAR reaches the "approval authority," however.

A service member may make an RAR from an immunization requirement by submitting a written request, addressed to the approval authority, to his or her unit commander. Hrg. Ex. 112 at 2, Filing 38-12 at 2. The RAR will include, in addition to other identifying information, the religious basis for the request; a comment on the sincerity of the request; and the substantial burden on the member's expression of religion. Hrg. Ex. 112 at 2, Filing 38-12 at 2. According to Maj. Streett, not all religious accommodation requests are the same. Thus, each request is reviewed individually by both the initial approval level decision authority and the appellate authority, if applicable. Hrg. Ex. 112 at 2, Filing 38-12 at 2. The review by these authorities is to determine (1) if there is a sincerely held religious belief (as opposed to moral or conscience belief), (2) if the vaccination requirement substantially burdens the applicant's religious exercise based upon a sincerely held religious belief, and if so, (3) whether there is a compelling government interest in

---

[5]The Court, like the parties, will call a request for a religious exemption a Religious Accommodation Request or "RAR."

requiring that specific requestor to be vaccinated, and (4) whether there are less restrictive means to further that compelling government interest. Hrg. Ex. 112 at 2–3, Filing 38-12 at 2–3.

This review is under Air Force policies and procedures for implementing requirements of RFRA and other applicable laws. Hrg. Ex. 112 at 2, Filing 38-12 at 2. Those policies and procedures recognize that the Air Force has a compelling governmental interest in mission accomplishment—including military readiness, unit cohesion, good order and discipline, and health and safety for both the unit and the member—which will be taken into account when considering service members' RARs. Hrg. Ex. 112 at 3, Filing 38-12 at 3. Furthermore, the policies require that any substantial burden imposed on a service member's religious exercise must employ the least restrictive means possible on expression of sincerely held religious beliefs. Hrg. Ex. 112 at 3, Filing 38-12 at 3.

After submitting an RAR to the unit commander, a service member consults with a chaplain, his commander, and a military medical provider. Each provides a written memorandum of their meeting to include in the RAR packet. Hrg. Ex. 112 at 4, Filing 38-12 at 4. The unit commander makes a recommendation to approve or deny the RAR based on review of the RAR packet and upon consultation with an installation's Religious Resolution Team (RRT). Hrg. Ex. 112 at 4, Filing 38-12 at 4. The RRT is comprised of the commander (or designee), the Senior Installation Chaplain, a public affairs officer, a member of the Staff Judge Advocate's Office, and a medical provider. Hrg. Ex. 112 at 3–4, Filing 38-12 at 3–4. The RRT reviews the packet and provides a written recommendation from the team, including dissenting views of any team members. The team may also request information. Hrg. Ex. 112 at 5–6, Filing 38-12 at 5–6. A separate written legal review for the packet is also provided. Hrg. Ex. 112 at 6, Filing 38-12 at 6.

The RAR packet is then routed through each commander in the chain of command, starting with the unit commander up to the approval authority.  Each commander provides an endorsement with a recommendation to approve or disapprove the request. Hrg. Ex. 112 at 6, Filing 38-12 at 6. Under applicable regulations, endorsements must address if there is a compelling government interest and any effect the accommodation will have on readiness, unit cohesion, good order and discipline, health, or safety.  The endorsements must further address the impact on the duties of the member and whether a less restrictive means can be used to meet the Air Force's compelling interest. Hrg. Ex. 112 at 6, Filing 38-12 at 6. As the packet is routed through the chain of command, it is also reviewed by an RRT at the final approval authority level. Hrg. Ex. 112 at 6, Filing 38-12 at 6.

Although there are timelines for final determination of either thirty or sixty days, depending on duty station and whether the service member is active duty or a reserve member, these timelines may not be met owing to the large number of RARs. Hrg. Ex. 112 at 7, Filing 38-12 at 7. Maj. Streett explains that if the final approval authority approves an RAR, a written approval is provided to the member's servicing Force Support Squadron to include in the member's electronic personnel record, and the member's unit commander will inform the member of the approved request. Hrg. Ex. 112 at 7, Filing 38-12 at 7. If a request is disapproved, the member may elect to appeal the disapproval within five days of notification through each level of command and ultimately to the final appeal authority, which is the Air Force Surgeon General. Hrg. Ex. 112 at 7–8, Filing 38-12 at 7–8.

According to statistics provided in the record of this case,[6] 96.8% of Air Force personnel are fully vaccinated against COVID-19 (and another 0.1% are partially vaccinated).[7] The April 26, 2022, report shows 1,013 medical exemptions have been approved with none currently pending.[8] There is no indication whether any were denied.[9] Statistics show that 1,273 administrative exemptions have been approved, with none pending, and no indication whether any were denied.[10] 5,569 RARs have been disapproved, with forty-one approved, and 2,362 still pending. 2,027 RAR appeals have been disapproved, with five approved, and 1,170 still pending.[11] According to the Court's calculations, these statistics show that as of April 26, 2022, of the 5,610 RARs processed at the first approval level, the Air Force has disapproved about 99.3%, and it has approved about 0.7%. These statistics show that, as of April 26, 2022, of the 2,032 RAR appeals processed, the Air Force has affirmed disapproval of almost 99.8%, and it has reversed (*i.e.*, approved) only a little over 0.2%. Near the end of the preliminary injunction hearing, Defendants' counsel clarified that, as of that day, the Air Force had not approved any RARs for service members who were not leaving the Air Force soon.

### 3. The Disciplinary Process for Failure to Comply with the Mandate

No administrative or disciplinary action is to be taken for failure to comply with the vaccination mandate during the exemption approval process and any appeal. Hrg. Ex. 112 at 7,

---

[6] In their briefs, Plaintiffs directed the Court's attention to an Air Force website publishing Air Force COVID-19 Statistics. *See* Filing 21 at 1, 3, 14, 15, 22; Filing 48 at 4 n.3, 26 n.10. These statistical reports were not submitted into evidence at the preliminary injunction hearing. Nevertheless, Defendants have not disputed these statistics, nor could they, as they are posted by the Secretary of the Air Force Public Affairs.

[7] https://www.af.mi/News/Article-Display/Article/2989918/daf-covid-19-statistics-apr-26-2022/.

[8] https://www.af.mi/News/Article-Display/Article/2989918/daf-covid-19-statistics-apr-26-2022/.

[9] https://www.af.mi/News/Article-Display/Article/2989918/daf-covid-19-statistics-apr-26-2022/.

[10] https://www.af.mi/News/Article-Display/Article/2989918/daf-covid-19-statistics-apr-26-2022/. Plaintiffs asserted at the preliminary injunction hearing that, in their brief, they relied on an earlier report from January 2022 for statistics on administrative exemptions because the number of those exemptions continually shrinks as service members who receive them leave the Air Force. It is true that the number of administrative exemptions shown as approved in the April 26, 2022, report is lower than the number of administrative exemptions shown as approved in the January 31, 2022, report, but it is not clear why. The report on religious exemptions appears to show a running tally.

[11] https://www.af.mi/News/Article-Display/Article/2989918/daf-covid-19-statistics-apr-26-2022/.

Filing 38-12 at 7. On December 7, 2021, Air Force Secretary Kendall issued another Memorandum making compliance with administrative and disciplinary requirements mandatory for service members "who requested separation or retirement prior to 2 November 2021, those whose requests for medical, religious or administrative exemption from the COVID-19 vaccine are denied, and those who refuse to take the COVID-19 vaccine." Hrg. Ex. 149 at 1, Filing 1-1 at 8. He specified that retiring or separating service members "may be granted an administrative exemption from the COVID-19 vaccination requirement until their retirement or separation date." Hrg. Ex. 149 at 1, Filing 1-1 at 8. The options for service members seeking medical, religious, or administrative exemptions were more involved:

> [U]nvaccinated regular Airmen or Guardians with a request for medical, religious, or administrative exemption will be temporarily exempt from the COVID-19 vaccination requirement while their exemption request is under review. Service members who receive a denial of their medical, religious, or administrative exemption request have five (5) calendar days from that denial to do one of the following: 1) Begin a COVID-19 vaccination regimen [and] [i]f the service member indicates his or her intent is to begin the vaccination regimen, commanders may use their discretion to adjust the timeline based on local COVID-19 vaccination supplies; 2) Submit an appeal to the Final Appeal Authority or request a second opinion (medical) [and] [i]f a final appeal or exemption is denied, the service member will have five (5) calendar days from notice of denial to begin the COVID-19 vaccination regimen; 3) If able, based upon the absence of or a limited Military Service Obligation (MSO), and consistent with opportunities afforded service members prior to 2 November 2021, request to separate or retire on or before 1 April 2022, or no later than the first day of the fifth month following initial or final appeal denial.

Hrg. Ex. 149 at 1–2, Filing 1-1 at 8–9. In short, although service members are exempt while their requests for any of the three kinds of exemptions are pending, upon denial of their requests, service members must choose between (1) getting the vaccine; (2) appealing the denial (or requesting a second opinion for a medical exemption), but if denied again, getting the vaccine; or (3) leaving the Air Force.

Secretary Kendall also set out disciplinary requirements resulting in discharge, as follows:

12

Regular service members who continue to refuse to obey a lawful order to receive the COVID-19 vaccine after their exemption request or final appeal has been denied or retirement/separation has not been approved will be subject to initiation of administrative discharge. Discharge characterization will be governed by the applicable Department of the Air Force Instructions. Service members separated due to refusal of the COVID-19 vaccine will not be eligible for involuntary separation pay and will be subject to recoupment of any unearned special or incentive pays.

Hrg. Ex. 149 at 2, Filing 1-1 at 9. This Memorandum included as attachments "unique guidance" for the Air Force Reserve and the Air National Guard. Hrg. Ex. 149 at 3–6, Filing 1-1 at 10–13. Thus, Secretary Kendall's Memorandum of December 7, 2021, made clear that discipline was to be imposed on service members whose exemption applications were disapproved but who still declined to be vaccinated. Hrg. Ex. 149 at 2, Filing 1-1 at 9.

As evidence of the disciplinary process for service members whose RARs are denied, the Defendants offer the declaration of Col. Elizabeth Hernandez. Hrg. Ex. 104, Filing 38-4. Col. Hernandez explains that Secretary Kendall "withheld" authority to take action on COVID-19 vaccination refusals in order to ensure consistency and uniformity in dispositions. Hrg. Ex. 104 at 2, Filing 38-4 at 2; *see also* Hrg. Ex. 147, Filing 1-1 at 5 (Secretary Kendall's 9/3/22 Memorandum). Therefore, in the case of a COVID-19 vaccination refusal, before any administrative or disciplinary action can be taken, the case must be reviewed by a Colonel (grade O-6) with special court-martial convening authority or higher rank. Hrg. Ex. 104 at 2, Filing 38-4 at 2. Potential dispositions for failing to obey a lawful order to receive the COVID-19 vaccine include adverse administrative actions, nonjudicial punishment, administrative demotions, administrative discharges, and courts-martial. Each such action follows its own timeline, specific to the needs of the Air Force, the member, and the commander. Hrg. Ex. 104 at 2, Filing 38-4 at 2. It appears that each disposition also has its own administrative appeal process. Also, the time for completion of the processes may range from approximately thirty days to more than a year,

depending on the nature of the proceeding and the severity of the possible outcome. Hrg. Ex. 104 at 2–6, Filing 38-4 at 2–6.

Regular service members who refuse to comply with the COVID-19 vaccination mandate without an exemption are subject to initiation of administrative discharge proceedings. Hrg. Ex. 104 at 4, Filing 38-4 at 4. Although there are some differences depending on the rank of the service members, the process starts with a notification from the service member's immediate commander of a recommendation for administrative discharge. Hrg. Ex. 104 at 4, Filing 38-4 at 4. The service member has an opportunity for free defense services and to respond before the recommendation goes to the separation authority for decision. Hrg. Ex. 104 at 4, Filing 38-4 at 4. That separation authority is often the senior commander in the unit (grade O-6/Colonel). Hrg. Ex. 104 at 4, Filing 38-4 at 4. Depending on the characterization of the service separation, however, the decision may move to a higher level and a formal administrative hearing may be required. Hrg. Ex. 104 at 4, Filing 38-4 at 4.

Traditional Reservists and Individual Mobilization Augmentees who refuse to comply with the COVID-19 vaccination mandate without an exemption are placed in a no pay/no points status and involuntarily reassigned to the Individual Ready Reserve (IRR). Hrg. Ex. 104 at 5, Filing 38-4 at 5. Active Guard and Reserve members who refuse to comply with the COVID-19 vaccination mandate without an exemption have their tour curtailed and are involuntarily reassigned to the IRR. Hrg. Ex. 104 at 5, Filing 38-4 at 5. Reassignment to the IRR is not a discharge or separation, and there is currently no policy mandating administrative separation for any of these service members. Hrg. Ex. 104 at 5, Filing 38-4 at 5.

Col. Hernandez provides the following concise explanation of the court-martial process:

A court-martial is a criminal trial for military members and is reserved for serious criminal offenses. There are three levels of courts-martial—general, special,

14

> and summary. If a service member were to face a court-martial for failing to obey a lawful order, the service member would be able to challenge the lawfulness of the order during the proceedings.
>
> Possible sentences in a court-martial include confinement, reduction in grade (enlisted only), and punitive discharges. For enlisted members, punitive discharges include bad conduct or dishonorable discharges. For commissioned officers, the punitive discharge available is a dismissal (the equivalent of a dishonorable discharge). Punitive discharges are adjudged in cases where a service member has committed serious misconduct.

Hrg. Ex. 104 at 5, Filing 38-4 at 5 (paragraph numbers omitted).

There is no evidence in the record that any Plaintiff or other service member has so far been tried or punished by a court-martial for refusal to comply with the COVID-19 vaccination mandate. Plaintiffs have submitted Plaintiff Barlow's Record of Nonjudicial Punishment Proceedings. Hrg. Ex. 27, Filing 63-1. That document indicates that Plaintiff Barlow was offered nonjudicial punishment, but that he has demanded trial by court-martial in lieu of nonjudicial punishment. Several Plaintiffs declare that they have been threatened with various kinds of discipline after their RARs were disapproved. *See, e.g.,* Hrg. Ex. 2 at 3, Filing 22 at 10; Hrg. Ex. 4 at 3, Filing 22 at 18–19; Hrg. Ex. 5 at 3, Filing 22 at 20.

### B. Procedural Background

Plaintiffs filed their Complaint in this action on March 8, 2022. They allege that they are thirty-six members of the United States Air Force (active duty), United States Air Force Reserve, or the Air National Guard. Filing 1 at 2. They further allege that many of them are stationed at Offutt Air Force Base near Omaha, Nebraska, and that several others are stationed at McConnell Air Force Base in Wichita, Kansas. Filing 1 at 2. As noted at the outset of this decision, they assert claims of violations of their rights under the Religious Freedom Restoration Act (RFRA), 42 U.S.C. § 2000bb *et seq.*, Filing 1 at 40, and the Free Exercise of Religion Clause of the First Amendment to the United States Constitution. Filing 1 at 46.

On March 18, 2022, Plaintiffs filed the Motion for Preliminary Injunction, Filing 20, now before the Court. Specifically, Plaintiffs request that the Court issue a preliminary injunction that does the following: (A) "[p]rohibit[s] Defendants, their agents, officials, servants, employees, and any other persons acting on their behalf from taking further steps toward the discharge of Plaintiffs or any member [of] the Air Force, Air Force Reserve, or Air National Guard who has filed a RAR"; (B) "compel[s] Defendants, their agents, officials, servants, employees, and any other persons acting on their behalf to restore the training and other career opportunities that Plaintiffs have been denied as a result of Plaintiffs' filing of RARs"; and (C) "prohibit[s] Defendants, their agents, officials, servants, employees, and any other persons acting on their behalf from denying travel, training, or other career opportunities to any member of the Air Force, Air Force Reserve, or Air National Guard who has filed or received a RAR." Filing 21 at 44-45. The references to "any member [of] the Air Force, Air Force Reserve, or Air National Guard who has filed a RAR" in parts (A) and (C) indicate that, at least as to those parts, Plaintiffs seek nationwide injunctive relief.

Defendants filed their Brief in Opposition on April 15, 2022. Filing 42. That same day, Defendants also filed a Motion to Dismiss and Motion to Sever. Filing 37. Defendants incorporated by reference some of their grounds for dismissal into their Brief in Opposition to Plaintiffs' Motion for a Preliminary Injunction, including failure to exhaust administrative remedies, lack of ripe claims, and consequent nonjusticiability of Plaintiffs' claims. Filing 42 at 20 n.5, 23 n.7, 28. Indeed, ripeness and justiciability issues were Defendants' counsel's first arguments for denial of a preliminary injunction at the preliminary injunction hearing. The Court declines to address those issues in this decision, however. Pursuant to a Text Order, Filing 36, which set a briefing schedule, Defendants' Motion to Dismiss and Motion to Sever will not be fully briefed until June 1, 2022, and Plaintiffs have not been heard on the issue of justiciability. The Court will not address

Defendants' grounds for dismissal in determining issues that relate to the Motion for Preliminary Injunction. On the other hand, the Court will consider evidence offered in support of Defendants' Motion to Dismiss and Motion to Sever that Defendants relied upon for purposes of resisting Plaintiffs' Motion for Preliminary Injunction.

Plaintiffs filed their Reply in support of their Motion for Preliminary Injunction on April 26, 2022. Filing 48. The Court set a hearing on the Motion for Preliminary Injunction for May 9, 2022. Filing 49. The Court indicated in the Text Order setting the hearing that it intended for this matter to be decided upon sworn affidavits or declarations; nevertheless, the Court set a deadline of 12:00 noon on May 4, 2022, for any request to present live witnesses. Filing 49. The Court set the same deadline for the filing of the parties' exhibit lists. Filing 49.

On May 3, 2022, the Court informed the parties, by email from a courtroom deputy, that the Court had scheduled 2.5 hours for the preliminary injunction hearing and that the Court expected the parties to plan accordingly. In the same email, the Court also advised the parties that the identity of any anonymous witness must be known to the Court and Defendants' counsel.[12]

Plaintiffs filed two motions on May 3, 2022, in response to the Court's email. First, Plaintiffs filed a Motion to Allow Live Witness Testimony. Filing 52. In that Motion, Plaintiffs sought leave to present live testimony from up to three of the Plaintiff Airmen. In an Order filed May 5, 2022, the Court granted the first Motion. The Court concluded, after reviewing the parties' written submissions, that properly limited witness testimony might be of some assistance to the proper disposition of the request for a preliminary injunction. Filing 56 at 2. Second, Plaintiffs filed a Motion for Protective Order to Limit Disclosure of Identity of Anonymous Witness. Filing 53. In that Motion, Plaintiffs sought a protective order to prevent the identity of a witness identified

---

[12] In the same email, the Court directed that exhibit binders must be provided to the Court, ideally by the close of business on May 5, 2022, if not sooner. The parties provided their exhibit binders well ahead of that deadline.

as "Airman #9" from being revealed at the preliminary injunction hearing. In the same May 5, 2022, Order, the Court granted the second Motion. Filing 56 at 4. The Court concluded that Plaintiffs had shown sufficiently "extraordinary" circumstances to warrant safeguarding the witness's identity. The Court stated that the part of the hearing during which Airman #9 testified would be closed to the public and that, in all other parts of the hearing, the airman was to be identified by the Court, the parties, and any witnesses as "Airman #9." Filing 56 at 4. The Court also imposed certain time limits on the presentation of evidence and arguments that the Court concluded would still provide the parties with a fair opportunity to present their positions.

At the preliminary injunction hearing, Plaintiffs presented testimony from three witnesses. Their first witness was Plaintiff Ian C. McGee, who is an active-duty Captain, a Company Grade Officer, and an Instructor Pilot for the RC-135 reconnaissance aircraft at Offutt Air Force Base. Plaintiffs' second witness was Airman #9, who is a Master Sergeant and Air Force Reservist in an intelligence squadron at Offutt Air Force Base where he is an Airborne Cryptologic Language Analyst (ACLA), serving on the ground or airborne on an RC-135. Plaintiffs' third witness was Armand G. Fondren II, who is a Lieutenant Colonel in the active-duty Air Force and an Instructor Pilot in the T-6 Texan II aircraft at Columbus Air Force Base in Columbus, Mississippi. The T-6 is used to instruct the Air Force's newest pilots through student pilot training and is their first military aircraft. At the preliminary injunction hearing, the Court also heard arguments from the parties.

At the conclusion of the preliminary injunction hearing, the Court observed that there seemed to be a considerable dispute about an issue that the Court considered to be important in this case. That issue is what an individual can do or cannot do if he or she has an exemption of any sort from the COVID-19 vaccination mandate. Therefore, the Court allowed each party until the

end of business on May 10, 2022, to provide a brief of no more than five pages in length addressing whatever issues that party wanted to tell the Court. The parties' supplemental briefs were timely filed. *See* Filing 65; Filing 66. With their Supplemental Brief, Plaintiffs submitted two additional exhibits, identified as Exhibits 34 and 35, Filing 65-1 and Filing 65-2, respectively. In their Supplemental Briefs, Defendants brought to the Court's attention several Air Force memoranda and policy statements related to the COVID-19 vaccination mandate available on public websites.

## II.  APPLICABLE STANDARDS

### A.  Preliminary Injunction Standards

Rule 65 of the Federal Rules of Civil Procedure provides that "[t]he court may issue a preliminary injunction only on notice to the adverse party." Fed. R. Civ. P. 65(a)(1). It also provides for consolidating the hearing on the preliminary injunction request with the trial on the merits. Fed. R. Civ. P. 65(a)(2). Here, Defendants have notice of the request for a preliminary injunction, the parties have thoroughly briefed the matter, and the Court held a hearing on the request that was not consolidated with the trial on the merits.

Rule 65(a) does not identify the standard the Court must apply in deciding whether or not to grant a request for a preliminary injunction. The Eighth Circuit Court of Appeals has reiterated that, to obtain a preliminary injunction, "'[a] plaintiff . . . must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest.'" *Tumey v. Mycroft AI, Inc.*, 27 F.4th 657, 664 (8th Cir. 2022) (bracketed numbers inserted) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008), and also citing

*Dataphase Sys., Inc. v. C.L. Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc)).[13] No single factor is dispositive. *Id.* at 665. Furthermore, a preliminary injunction is an extraordinary remedy never awarded as of right; the primary function of a preliminary injunction is preserving the *status quo* until the district court has an opportunity to grant full effective relief; and requiring a non-movant to take affirmative action goes beyond the purpose of a preliminary injunction. *Id.* at 664. Lastly, the burden of establishing the propriety of a preliminary injunction is on the movant. *Id.*

As the Court indicated at the outset of this opinion, the factor that is dispositive of Plaintiffs' request for a preliminary injunction is the first *Winter* factor, the movant's likelihood of success on the merits. *Tumey*, 27 F.4th at 664 (citing *Winter*, 555 U.S. at 20). "While no single factor is determinative, the probability of success factor is the most significant." *Id.* at 665 (quoting *Carson v. Simon*, 978 F.3d 1051, 1059 (8th Cir. 2020) (cleaned up)). This factor requires the movant to demonstrate "at least a 'fair chance of prevailing.'" *Wildhawk Invs., LLC v. Brava I.P., LLC*, 27 F.4th 587, 593 (8th Cir. 2022) (quoting *Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*, 826 F.3d 1030, 1041 (8th Cir. 2016)). A "fair chance of success" also requires "an adequate showing of a nexus between the unlawful conduct and the responsible individuals." *Tumey*, 27 F.4th at 667. The likelihood of success is considered in light of the elements of the movant's claim. *See, e.g.*, *301, 712, 2103 & 3151 LLC v. City of Minneapolis*, 27 F.4th 1377, 1383 (8th Cir. 2022) (analyzing likelihood of success in light of the elements of the movant's "takings" claim).

---

[13] Courts in this Circuit have, for decades, called the considerations for determining whether to grant a TRO or a preliminary injunction the "*Dataphase* factors," set out in *Dataphase Sys., Inc. v. C.L. Sys., Inc.*, 640 F.2d 109 (8th Cir. 1981) (en banc). The much more recent statements of the pertinent considerations by the Supreme Court in *Winter* and by the Eighth Circuit Court of Appeals in *Tumey*, while identifying the same considerations, give them sufficiently different definition to warrant reference to the "*Winter* factors" rather than the "*Dataphase* factors." *Compare Winter*, 555 U.S. at 20 (as quoted in the body of this decision), *with Dataphase*, 640 F.2d at 114 ("[W]hether a preliminary injunction should issue involves consideration of (1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest.").

Here, the Court must consider Plaintiffs' likelihood of success in light of their religion-based claims. The Court will begin and end its analysis with Plaintiffs' RFRA claim: If Plaintiffs cannot show that a preliminary injunction is appropriate based on that claim, this Court concludes they cannot do so based on their Free Exercise claim. *See, e.g., New Doe Child #1 v. United States*, 901 F.3d 1015, 1025 (8th Cir. 2018) ("By its terms, RFRA offers greater protection than the Free Exercise Clause.").

**B.  RFRA Standards**

*1.  The Burden-Shifting Analysis Under RFRA*

As the Supreme Court has explained, RFRA "prohibits the Federal Government from imposing substantial burdens on religious exercise, absent a compelling interest pursued through the least restrictive means." *Tanzin v. Tanvir*, 141 S. Ct. 486, 489 (2020) (citing 42 U.S.C. § 2000bb *et seq.*). Indeed, the statute "provides that the 'Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability.'" *New Doe Child #1 v. United States*, 901 F.3d 1015, 1025 (8th Cir. 2018) (quoting 42 U.S.C. § 2000bb-1(a)). The Supreme Court also explained that RFRA "gives a person whose religious exercise has been unlawfully burdened the right to seek 'appropriate relief.'" *Tanzin*, 141 S.Ct. at 489.

To obtain relief under RFRA, a claimant must first establish that the Government has substantially burdened the exercise of his or her religion with its challenged policy, law, or action. *New Doe Child #1*, 901 F.3d at 1025. If a claimant does so, "under the Act that person is entitled to an exemption from the rule unless the Government 'demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.'" *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 694–95 (2014) (quoting 42 U.S.C. § 2000bb–1(b)). The Eighth Circuit Court of Appeals has recognized that both "furtherance of a compelling interest" and "least

21

restrictive means" under RFRA are questions of law. *United States v. Anderson*, 854 F.3d 1033, 1037 (8th Cir. 2017).

### 2. *RFRA Applies to the Military*

The Court agrees with the parties that RFRA applies to the military. As one of the courts to address this question in the context of a military COVID-19 vaccination mandate explained, "RFRA applies to the 'government,' which is defined to include a branch, department, agency, instrumentality, and official (or other person acting under color of law) of the United States." *Navy Seal 1 v. Austin*, No. 8:21-CV-2429-SDM-TGW, 2022 WL 534459, at *13 (M.D. Fla. Feb. 18, 2022) (quoting *Singh v. McHugh*, 185 F. Supp. 3d 201, 217–18 (D.D.C. 2016), and citing 42 U.S.C. § 2000bb–2(1)). That court concluded that RFRA plainly applies to the Navy. *Id.* This Court agrees that RFRA's definition of "government" plainly includes the Air Force; thus, RFRA applies to the Air Force. *Accord Poffenbarger*, 2022 WL 594810, at *8. Defendants do not dispute this point. Indeed, Defendants offered evidence that the Air Force's process for deciding whether to grant RARs from the COVID-19 vaccination mandate complies with RFRA. Hrg. Ex. 112 at 2, Filing 38-12 at 2.

### 3. *No Deference is Due Military Decision-Making Under RFRA*

One contested issue in this and other military COVID-19 vaccine cases is the degree of deference (if any) that courts must extend to the military's decision-making, under either RFRA or the Free Exercise Clause. In *Winter*, the decision from which the preliminary injunction factors are drawn, the Supreme Court explained that when a case "involves 'complex, subtle, and professional decisions as to the composition, training, equipping, and control of a military force,'" those are "essentially professional military judgments." 555 U.S. at 24 (quoting *Gilligan v. Morgan*, 413 U.S. 1, 10 (1973)). Thus, courts "give great deference to the professional judgment

of military authorities concerning the relative importance of a particular military interest." *Id.* (quoting *Goldman v. Weinberger*, 475 U.S. 503, 507 (1986)).

Defendants assert that "great deference" should be applied in this case even when considering Plaintiffs' RFRA claim. Filing 42 at 19. They argue that such deference extends to constitutional claims and military decisions about the health and welfare of the service members. Filing 42 at 20. Defendants point out that at least one court considering a preliminary injunction in a case concerning a military branch's COVID-19 vaccination mandate concluded that such deference was applicable when assessing either an RFRA or a Free Exercise Clause challenge. Filing 42 at 21 (citing *Short v. Berger*, 22-cv-1151, 2022 WL 1051852 (C.D. Cal. Mar. 3, 2022)).

Plaintiffs argue that Defendants have overstated the deference afforded the military. They argue that constitutional protections extend to the conduct of the military toward service members. Filing 48 at 10. Plaintiffs further argue that RFRA's imposition of the compelling government interest test is applicable, even in the military context, for two reasons. The first reason is that RFRA is a sort of "super statute." The second reason is that RFRA is consistent with the constitutional requirement that Congress make rules for regulation of the military. Filing 48 at 11. Plaintiffs also argue that the military has no special expertise in matters of medical science, so that no deference to the military is warranted in such matters. Filing 48 at 11.

In *Winter*, the plaintiffs sued the Navy, seeking declaratory and injunctive relief on the grounds that the Navy's sonar training exercises violated the National Environmental Policy Act, the Endangered Species Act of 1973, and the Coastal Zone Management Act of 1972. 555 U.S. at 16–17. The Supreme Court concluded that "[t]he lower courts failed properly to defer to senior Navy officers' specific, predictive judgments about how the preliminary injunction would reduce the effectiveness of the Navy's [sonar] training exercises." *Id.* at 27. Thus, it is clear that "military

23

deference" applies to some statutory claims. The Supreme Court has also applied "military deference" in cases involving constitutional claims. *See Richenberg v. Perry*, 97 F.3d 256, 261 (8th Cir. 1996) (substantive due process claim); *Goldman*, 475 U.S. at 507 (constitutional free exercise of religion claim). The question in this case, at least for present purposes, is whether such deference is applicable on an RFRA claim, which is statutory rather than constitutional.

One district court considering the Navy's COVID-19 vaccination mandate observed, "Whether and to what extent military judgments are . . . due some degree of deference under RFRA is a matter of some debate." *Navy Seal 1 v. Austin*, No. CV 22-0688 (CKK), 2022 WL 1294486, at *8 (D.D.C. Apr. 29, 2022). That court opined that under RFRA, "the degree of deference to the military's tailoring depends on the degree of military and scientific expertise necessary to make that judgment." *Id.* at *8. Thus, that court considered the service members' RFRA claim "with the standards of review on a military RFRA claim in mind." *Id.* In another case, a district court considering an RFRA claim concluded that it was required to give great deference to the judgment of the United States Marine Corps (USMC) on the need for a particular restriction on religiously motivated conduct in its analysis of a motion for a preliminary injunction to enjoin the USMC's COVID-19 vaccination mandate. *Short v. Berger*, 22-cv-1151, 2022 WL 1051852, at *7 and n.12 (C.D. Cal. Mar. 3, 2022). Yet another district court concluded that it must "proceed cautiously and consider the deference given to military decisions" in its consideration of an RFRA claim in the context of a motion for a preliminary injunction to enjoin the Air Force's COVID-19 vaccination mandate. *Poffenbarger v. Kendall*, No. 3:22-CV-1, 2022 WL 594810, at *10 (S.D. Ohio Feb. 28, 2022). Thus, decisions from the lower courts suggest that some degree of deference to military decision-making is appropriate in this case, even when the Court considers Plaintiffs' RFRA claim.

Most recently, the Supreme Court, in an unsigned, one-paragraph opinion, granted a partial stay of an injunction against the Navy's COVID-19 vaccination mandate, which had been based on likelihood of success on an RFRA claim. *Austin v. U. S. Navy Seals 1-26*, 142 S. Ct. 1301 (2022). The Supreme Court stayed the preliminary injunction "insofar as it precludes the Navy from considering respondents' vaccination status in making deployment, assignment, and other operational decisions." *Id.* The Supreme Court's opinion provided no explanation for staying this portion of the preliminary injunction. In Justice Kavanaugh's concurrence, however, after discussing the deference due the military, Justice Kavanaugh stated that he "s[aw] no basis in this case for employing the judicial power in a manner that military commanders believe would impair the military of the United States as it defends the American people." *U. S. Navy Seals 1-26*, 142 S. Ct. at 1302 (Kavanaugh, J., concurring). This Court is unwilling to read into the silence of the majority opinion on the issue and Justice Kavanaugh's concurrence that this Court is to conduct a different, more deferential, analysis when applying RFRA to military decision-making. Indeed, as outlined below, the Court concludes the plain language of the statute requires otherwise.

This Court concludes that a more instructive decision on whether RFRA requires deference to military decision-making is the Supreme Court's decision in *Holt v. Hobbs*, 574 U.S. 352 (2015). It is true that *Holt* did not involve RFRA, but what the Supreme Court described as its "sister statute," the Religious Land Use and Institutionalized Persons Act (RLUIPA), which requires the same "more focused inquiry" as RFRA. 574 U.S. at 356. In *Holt*, the Supreme Court considered whether it was bound to defer to prison officials' assertion that allowing a prisoner to grow a beard would undermine the prison's interest in suppressing contraband. *Id.* at 364. The Supreme Court concluded, "RLUIPA, like RFRA, 'makes clear that it is the obligation of the courts to consider whether exceptions are required under the test set forth by Congress.'" *Id.* at 364

25

(quoting *Gonzales v. O Centro Espírita Beneficente Uniao do Vegetal*, 546 U.S. 418, 434 (2006)).

The Supreme Court cautioned,

> Prison officials are experts in running prisons and evaluating the likely effects of altering prison rules, and courts should respect that expertise. But that respect does not justify the abdication of the responsibility, conferred by Congress, to apply RLUIPA's [or RFRA's] rigorous standard.

*Holt*, 574 U.S. at 364. Thus, while courts should "respect" the military's expertise in certain matters, they must still apply RFRA's "rigorous standard," which this Court concludes means without deference as to any determination required by RFRA.

Nevertheless, Defendants point to legislative history as showing that Congress intended for this deference to military decision-making to apply in RFRA cases. Indeed, such legislative history was the basis for giving deference to the military on RFRA claims in the vaccination mandate decisions from the district courts cited above. *See Navy Seal 1*, 2022 WL 1294486, at *8; *Berger*, 2022 WL 1051852, at *7 n.12; *Poffenbarger*, 2022 WL 594810, at *17. This Court is not convinced, however, that comments of a single member of Congress or even a congressional committee report on pending legislation is indicative of the ultimate legislative intent, let alone indicative of the scope of a statute as ultimately enacted.

Instead, this Court is guided by the Supreme Court's explicit instructions to courts "to look to the text of the statute and the statute's placement within the statutory scheme to discern congressional intent." *United States v. Daifullah*, 11 F.4th 888, 893–94 (8th Cir. 2021) (citing *Henderson v. Shinseki*, 562 U.S. 428, 436 (2011)), *cert. denied sub nom. Naser Daifullah v. United States*, 142 S. Ct. 901 (2022). Furthermore, "[w]hen a statute includes an explicit definition, [courts] must follow that definition, even if it varies from a term's ordinary meaning." *Tanzin*, 141 S. Ct. at 490 (internal quotation marks and citations omitted). As pointed out above in Section II.B.2., "RFRA applies to the 'government,' which is defined to include a branch, department,

26

agency, instrumentality, and official (or other person acting under color of law) of the United States." *Navy Seal 1 v. Austin*, No. 8:21-CV-2429-SDM-TGW, 2022 WL 534459, at *13 (M.D. Fla. Feb. 18, 2022) (quoting *Singh v. McHugh*, 185 F. Supp. 3d 201, 217–18 (D.D.C. 2016), and citing 42 U.S.C. § 2000bb–2(1)). Thus, RFRA plainly applies to the military. Just as importantly, there simply is no language in RFRA that requires a different level of deference to military decision-making than courts must apply to decision-making by any other governmental entity that falls within the scope of RFRA. Thus, this Court will not give the Air Force any different level of deference than it would give any other governmental entity when assessing Plaintiffs' likelihood of success on their RFRA claim.[14]

That conclusion, however, does not necessarily mean that the Plaintiffs have shown sufficient likelihood of success on their claim that the Air Force's COVID-19 vaccination mandate violates RFRA to warrant issuance of a preliminary injunction.

### III. PLAINTIFFS LACK THE REQUIRED LIKELIHOOD OF SUCCESS ON THEIR RFRA CLAIM

The Court now turns to application of the "likelihood of success" factor in the preliminary injunction analysis to Plaintiffs' RFRA claim, in light of the elements of that claim. *See Tumey*, 27 F.4th at 664 (identifying this factor (citing *Winter*, 555 U.S. at 20)); *see also City of Minneapolis*, 27 F.4th at 1383 (applying the factors in light of the elements of the claim). Defendants do not deny that the challenged governmental action, the Air Force's COVID-19 vaccination mandate, "substantially burdens" Plaintiffs' claimed religious exercise. *See 42 U.S.C.*

---

[14] It is interesting, though not determinative, that RFRA was enacted to overturn the Supreme Court's method of analyzing free-exercise claims in *Employment Div., Dept. of Human Resources of Ore. v. Smith*, 494 U.S. 872 (1990). *See, e.g., Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 694 (2014) ("Congress responded to [*Employment Div., Dept. of Human Resources of Ore. v. Smith*, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990)] by enacting" the Religious Freedom Restoration Act); *42 U.S.C. §§ 2000bb(a)(4)*, (b)(1) (stating that RFRA was meant to restore the legal framework in place prior to *Smith*); *accord Tanzin*, 141 S. Ct. at 489. Thus, perhaps it is not surprising that RFRA also abrogated the principle of judicial deference to military decision-making, which was also a caselaw-created doctrine.

§ 2000bb-1(a); *New Doe Child #1*, 901 F.3d at 1025 (explaining that, to obtain relief under RFRA, a plaintiff must establish that the Government has substantially burdened the exercise of his or her religion). Thus, the analysis of Plaintiffs' likelihood of success on their RFRA claim turns to the part of the RFRA analysis where Defendants must show that application of the burden of the Air Force's COVID-19 vaccination mandate to the person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest. *Burwell*, 573 U.S. at 695.

### A. The Air Force Conducted the Individualized Analysis Required by RFRA

Plaintiffs argue that, notwithstanding the explicit language of RFRA and the Supreme Court's holding in *Burwell*, the Air Force did not conduct the required "to the person" analysis of whether application of the Air Force's COVID-19 vaccination mandate furthered a compelling interest. Filing 21 at 17–18, 26. Plaintiffs argue that, because they have received virtually identical letters rejecting their RARs, there was no individualized consideration of their RARs. *See, e.g.,* Filing 21 at 18–19. Evidence in the record does not fully support that contention.

The appeal denial letters, by Lt. Gen. Robert I. Miller, the Surgeon General of the Air Force, submitted by Plaintiffs, demonstrate at least some individualized consideration in each RAR. *See* Hrg. Ex. 15, Filing 48-5 (Maj. Bexten); Hrg. Ex. 16, Filing 48-6 (Lt. Col. Fondren); Hrg. Ex. 17, Filing 48-7 (Maj. Roth); Hrg. Ex. 18, Filing 48-8 (Staff Sgt. Roberts). The first and third paragraphs and parts of the second paragraph are identical or nearly identical in the four letters. They state the following:

> Your final appeal is denied. In accordance with Department of the Air Force Instruction (DAFI) 52-201, Religious Freedom in the Department of the Air Force, paragraph 3.2, I have carefully reviewed your request for religious accommodation, specifically for an exemption from the COVID-19 immunization.

The Department of the Air Force has a compelling government interest in requiring you to comply with the requirement for the COVID-19 immunization because preventing the spread of disease among the force is vital to mission accomplishment. In light of your circumstances, your present duty assignment requires time in and around the confined spaces of aircraft as well as frequent contact with others, and these duties are not fully achievable via telework or with adequate distancing. . . . . We must be able to leverage our forces on short notice as evidenced by recent worldwide events. Your health status as a non-immunized individual in this dynamic environment, and aggregated with other non-immunized individuals in steady state operations, would place health and safety, unit cohesion, and readiness at risk. Foregoing the above immunization requirements would have a real adverse impact on military readiness and public health and safety. There are no less restrictive means available in your circumstance as effective as receiving the above immunizations in furthering these compelling government interests.

A copy of this decision memorandum will be placed in your automated personnel records. Please contact your unit leadership with questions or concerns.

Nevertheless, there is an individualized insertion in each of these letters where the ellipses appear in the quotation above. For Maj. Bexten, that insertion states,

Your instructor role also requires frequent contact and immersion with multiple individuals, which would significantly impact training accomplishment if you, your trainees, or your fellow instructors were exposed or actively infected.

Hrg. Ex. 15, Filing 48-5. In contrast, for Lt. Col. Fondren, the insertion states,

In addition, your deployable position may require you to deploy in a timeframe in which you cannot attain fully immunized status prior to departure and others may need to deploy in your place. Your leadership role was also taken into consideration. While some of these duties may be completed remotely, institutionalizing remote completion of those duties permanently would be detrimental to readiness, good order and discipline, and unit cohesion.

Hrg. Ex. 16, Filing 48-6. Another individualized insertion, in Maj. Roth's appeal denial letter, includes his "leadership role" in the same language as Lt. Col. Fondren's and his "instructor role" in the same language as Maj. Bexten's. *See* Hrg. Ex. 17, Filing 48-7. Nevertheless, Maj. Bexten's appeal denial letter is not "identical" to either of the others discussed so far.

The individualized insertion in Staff Sgt. Victoria S. Roberts's appeal denial letter, Hrg. Ex. 18, Filing 48-8, does not include the language concerning "time in and around the confined

spaces of aircraft as well as frequent contact with others, and these duties are not fully achievable via telework or with adequate distancing" found in the other three letters. Instead, it includes the following reason: "Specifically, in light of your circumstances, your present duty assignment in Combat Crew Communication requires intermittent to frequent contact with others and is not fully achievable via telework or with adequate distancing." Hrg. Ex. 18, Filing 48-8. It then includes her "instructor role" in the same language as Maj. Bexten's letter. Hrg. Ex. 18, Filing 48-8. The last individualized insertion—"In addition, working in confined spaces while working with secured material, places you and others who utilize the space at risk for exposure," Hrg. Ex. 18, Filing 48-8—is different from ones in all three of the other denial letters that Plaintiffs submitted to the record.

Perhaps more importantly, Defendants contend that the notices of initial denials and the notices of appeal denials are not meant to be comprehensive explanations of the individualized assessment of each RAR packet through the chain of command and the RRT reviews. Filing 42 at 23 n.8. The Court finds that the appeal denial letters plainly do not contain the complete individualized assessment of the applicants' RARs. The Court further finds that the appeal denial letters are not comprehensive explanations of the individualized assessment through all the levels of the chain of command that had input into the process.

Plaintiffs contend that the appeal denial letters are a "plug-and-chug" task for Gen. Miller's staff to write. Filing 48 at 21. They also contend that the Air Force's individualized assessments are "a sham." Filing 21 at 18. Indeed, at the preliminary injunction hearing, Plaintiffs' counsel argued that the RAR process is "pure theater," because every RAR will be denied. Plaintiffs' counsel further argued that every single one of the small number of RARs that have been granted involved airmen nearing retirement. Therefore, those airmen could have qualified for an

administrative exemption. Plaintiffs offer as confirmation Hrg. Ex. 14, Filing 48-4, which is a rare letter granting an RAR. It states in pertinent part,

> After careful consideration of the specific facts and circumstances, I grant your request for an accommodation. Specifically, my decision is based on your leave status and entry into a DoD SkillBridge internship that will take you out of your duty section beginning 1 April 2022 and carry you through to your retirement on 1 October 2022. Thus, you will not be returning to your duty section past 1 April 2022.

Hrg. Ex. 14, Filing 48-4. This letter illustrates that the basis for granting the exemption was administrative. Near the end of the preliminary injunction hearing, Defendants' counsel stated that as of the day of the hearing, the Air Force had not approved any RARs for service members who were not leaving the Air Force.

The Court finds that Defendants made individualized determinations of the harm to the Air Force's compelling interests in readiness and health and safety of service members, including the individual applicants, of granting specific exemptions to particular religious claimants. *See Burwell*, 573 U.S. at 726–27. As Defendants contend, Filing 42 at 22-23, the evidence shows that the Air Force conducted an individualized analysis, as explained by Maj. Streett, Hrg. Ex. 112, Filing 38-12.[15] That analysis is specifically required to consider, at the unit level and on up through the chain of command, whether the individual service member's religious exemption would impact "military readiness, unit cohesion, good order and discipline, or public health and safety for both the individual and unit levels." Hrg. Ex. 112 at 3, Filing 38-12 at 3.

The Court cannot accept Plaintiffs' contention that the nearly identical appeal denial letters demonstrate the lack of the required individualized consideration. First, the "operative" parts of the letters—the parts that summarize the basis for denial—are individualized to each service member's circumstances. Second, it is not surprising that numerous requests, even considered

---

[15] This is summarized above in Section I.A.2., beginning on page 7.

individually, could run afoul of the same handful of circumstances warranting denial of an exemption. This is particularly true in the military, where numerous personnel may perform identical or similar jobs in identical or similar circumstances.

Further, RFRA requires the Air Force to conduct a certain individualized process when considering RARs. If after conducting such process and following the requirements of RFRA the Air Force concludes all RARs for the COVID-19 vaccine should be denied, then the Air Force has complied with the law and the denials of all applications are not evidence otherwise.

Thus, the Air Force's purported failure to perform the individualized consideration required by RFRA is not supported by the record, so far, and it does not suggest that Plaintiffs have the required likelihood of success on their RFRA claim to warrant a preliminary injunction. *See Tumey*, 27 F.4th at 664 (citing *Winter*, 555 U.S. at 20); *Wildhawk Invs.*, 27 F.4th at 593.

### B. The Air Force's COVID-19 Vaccination Mandate Furthers a Compelling Interest

*1. The "Compelling Interest" Analysis Under RFRA*

Next, Plaintiffs contend that there is no "compelling interest" for the Air Force's COVID-19 vaccination mandate, as required by RFRA. Filing 21 at 23–32; Filing 48 at 6–15. In *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014), the Supreme Court considered a RFRA claim by three closely held corporations that challenged a mandate from the United States Department of Health and Human Services (HHS) that the corporations provide health insurance coverage for methods of contraception that violated the sincerely held religious beliefs of the companies' owners. 573 U.S. at 689–90. As pertinent here, the Supreme Court observed that many of the interests that the HHS mandate purportedly furthered had, at least initially, been "couched in very broad terms," such as "promoting 'public health' and 'gender equality.'" *Id.* at 726. The Supreme Court stated,

>RFRA, however, contemplates a "more focused" inquiry: It "requires the Government to demonstrate that the compelling interest test is satisfied through application of the challenged law 'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened." *[Gonzales v.] O Centro [Espírita Beneficente Uniao do Vegetal]*, 546 U.S. [418,] 430–431, 126 S.Ct. 1211 [(2006)] (quoting § 2000bb–1(b)). This requires us to "loo[k] beyond broadly formulated interests" and to "scrutiniz[e] the asserted harm of granting specific exemptions to particular religious claimants"—in other words, to look to the marginal interest in enforcing the [governmental] mandate in these cases. *O Centro, supra*, at 431, 126 S.Ct. 1211.

*Burwell*, 573 U.S. at 726–27.

In *Burwell*, the Supreme Court looked, first, at more narrowly framed interests, noting that "HHS maintains that the mandate serves a compelling interest in ensuring that all women have access to all FDA-approved contraceptives without cost sharing." *Id.* at 727. The Supreme Court's analysis gives little hint of what "demonstrate[s] that the compelling interest test is satisfied through application of the challenged law 'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened." *Id.* at 726. That is because the Supreme Court "assume[d] that the interest in guaranteeing cost-free access to the four challenged contraceptive methods [wa]s compelling within the meaning of RFRA." *Id.* at 728. The Supreme Court did not then explain how the Government had demonstrated that application of the burden from the contraceptive rule "to the person" was in furtherance of a compelling governmental interest. *See id.* at 726; *see also* 42 U.S.C. § 2000bb-1(b). Instead, in *Burwell*, the Supreme Court passed on to "the final prong of the RFRA test," which considers whether "the [challenged] mandate is 'the least restrictive means of furthering that compelling governmental interest.'" *Id.* (quoting 42 U.S.C. § 2000bb-1(b)(2)).

The Supreme Court subsequently considered a case under the Religious Land Use and Institutionalized Persons Act (RLUIPA), which requires the same "more focused inquiry" as RFRA. *Holt v. Hobbs*, 574 U.S. 352, 356 (2015). In that case, the Supreme Court considered a

challenge to application of the Arkansas Department of Correction's grooming policy—which prohibited inmates from growing beards unless they had a particular dermatological condition—to a petitioner who sought to grow a ½-inch beard for religious reasons. *Id.* at 356, 359. The Supreme Court "readily agree[d] that the Department has a compelling interest in staunching the flow of contraband into and within its facilities, but the argument that this interest would be seriously compromised by allowing an inmate to grow a ½–inch beard is hard to take seriously." *Id.* at 363.

This "compelling interest in staunching the flow of contraband into and within [correctional] facilities" was "more focused" than "promoting 'public health' and 'gender equality.'" *Burwell*, 573. at 726. It was comparable to the "more focused" interest the Supreme Court assumed was "compelling" in *Burwell*. *Id.* at 727 (assuming that "ensuring that all women have access to all FDA-approved contraceptives without cost sharing" was sufficiently "compelling" to satisfy RFRA).

What is important here is that in *Holt*, the Supreme Court provided more insight into how to analyze whether the Government "demonstrate[s] that the compelling interest test is satisfied through application of the challenged law 'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened," as required by *Burwell*, 573 U.S. at 726, and § 2000bb-1(b). Specifically, in *Holt*, the Supreme Court considered whether the compelling interest in staunching the flow of contraband into and within prison facilities would be compromised by allowing the claimant to grow a ½-inch beard, as an exception to the "no beards" policy, which burdened the petitioner's religious exercise. *Holt*, 574 U.S. at 363. Thus, in *Holt*, the Supreme Court "scrutiniz[ed] the asserted harm of granting specific exemptions to particular religious claimants." *Burwell*, 573 U.S. at 726–27. To put it in the terms of § 2000bb-1(b), the

Supreme Court considered whether application of the "no beards" mandate "to the person" whose religious exercise was burdened by it was "in furtherance of a compelling governmental interest" in staunching the flow of contraband into and within correctional facilities. *Holt*, 574 U.S. at 363.

### 2. The Air Force's Interest is "Compelling"

Here, the Air Force's interest in preventing COVID-19 from impairing the readiness and health of its forces, including individual service members like Plaintiffs,[16] is "compelling." As one court considering the Air Force's COVID-19 vaccination mandate observed, "It would be a waste of time and wrong to state that '[s]temming the spread of COVID-19' isn't a compelling interest— the Supreme Court has already decided it is." *Air Force Officer v. Austin*, No. 5:22-CV-00009-TES, 2022 WL 468799, at *9 (M.D. Ga. Feb. 15, 2022) (citing *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020)). This Court concludes that the Air Force has also narrowly or specifically framed its interest as preventing COVID-19 from impairing the readiness and health of its forces, including individual service members like Plaintiffs, which the COVID-19 vaccination mandate is intended to further. *See* Hrg. Ex. 112 at 3, Filing 38-2 at 3. Therefore, that interest is also a "compelling interest" within the meaning of RFRA. *Cf. Burwell*, 573 U.S. at 727; *Holt*, 574 U.S. at 363.

### a. Most of Plaintiffs' Challenges to the Air Force's Compelling Interest are Misdirected

Even so, Plaintiffs challenge the sufficiency of the interest on several grounds. First, Plaintiffs argue that Defendants cannot establish a compelling interest in refusing to grant exemptions to Plaintiffs because the Air Force has already granted thousands of exemptions,

---

[16] This is a somewhat simplified paraphrase of the Air Force's interest in mission accomplishment, including military readiness, unit cohesion, good order and discipline, and health and safety for both the unit and the member. *See* Hrg. Ex. 112 at 3, Filing 38-12 at 3. At the same time, it is a slightly expanded paraphrase of Secretary Austin's statement of the purpose of the COVID-19 mandate as "protect[ing] the Force and defend[ing] the American People." Hrg. Ex. 146, Filing 1-1 at 2.

specifically, administrative and medical exemptions. Filing 21 at 26; Filing 48 at 8. In other words, they argue that Defendants cannot have a compelling interest in a particular Plaintiff being vaccinated while so many other Air Force service members are not. Filing 21 at 26 (citing *Air Force Officer*, 2022 WL 468799, at *10, and *U.S. Navy Seals 1-26 v. Biden*, 27 F.4th 336, 352 (5th Cir. 2022)). Next, Plaintiffs assert that there is no compelling interest, because the Air Force has deployed multiple Plaintiffs, which shows that universal vaccination is not necessary to serve the Air Force's interest in military readiness. Filing 21 at 27; Filing 48 at 13. Plaintiffs also contend that Defendants do not have a compelling interest because the marginal impact of denial of individual RARs amounts to nothing more than eking out another fraction of a percentage point of service members in compliance with the vaccination mandate. Filing 21 at 29. Their next argument is that it is now well-established that COVID-19 vaccinations do not stop people from becoming infected with or transmitting COVID-19. Filing 21 at 29; Filing 48 at 11. Plaintiffs argue that the Air Force's own delay in establishing the COVID-19 vaccination mandate, during which time service members' immunity increased and the need for additional vaccination decreased, shows that the Air Force lacks the required "compelling interest." Filing 21 at 31. Indeed, Plaintiffs argue that a "compelling interest" under RFRA requires Defendants to demonstrate a compelling interest in not granting any exemptions. Filing 48 at 7.

The problem with these challenges is that most, if not all, confuse the Air Force's "compelling interest" with whether the Air Force's chosen means furthers that "compelling interest." *See* 42 U.S.C. § 2000bb-1(b)(1) (requiring a demonstration "that application of the burden [of the governmental action] to the person . . . is in furtherance of a compelling governmental interest"). They also confuse the Air Force's "compelling interest" with whether the Air Force's chosen means is "the least restrictive means" to further its "compelling interest." *See*

42 U.S.C. § 2000bb-1(b)(2) (requiring a demonstration that the Government's action "is the least restrictive means of furthering that compelling governmental interest"). Indeed, that confusion persisted during arguments at the conclusion of the preliminary injunction hearing.

This Court has not found anything in *Burwell*, *Holt*, or other controlling authority indicating that the "compelling interest" at issue in RFRA is the "means" the Government chose. This is so, even though the "means" is the Government policy, law, or action that "substantially burdens" a person's exercise of religion. *See* 42 U.S.C. § 2000bb-1(a). The Government's chosen "means" is what must further the "compelling interest" to satisfy the first prong of the statutory defense to a RFRA claim. *See* 42 U.S.C. § 2000bb-1(b). Here, as explained in the preceding subsection, the Air Force's "compelling interest" is preventing COVID-19 from impairing the readiness and health of its forces, including individual service members like Plaintiffs. *See* Hrg. Ex. 112 at 3, Filing 38-2 at 3. The Air Force's chosen "means" is the COVID-19 vaccination mandate. *See* Hrg. Ex. 146, Filing 1-1 at 2 (Secretary Austin's statement that "I have determined that mandatory vaccination against coronavirus 2019 (COVID-19) is necessary to protect the Force and defend the American People."). The Court also has not found anything in *Burwell*, *Holt*, or other controlling authority indicating that the Government must demonstrate a compelling interest in not granting any exemptions to the challenged "means." *Contra* Filing 48 at 7. Instead, here, Defendants must demonstrate that the compelling interest they assert is furthered by applying the Air Force's COVID-19 vaccination mandate to every Plaintiff whose RAR was denied. 42 U.S.C. § 2000bb-1(b). Thus, it is Plaintiffs, not Defendants, who have incorrectly framed the "compelling interest" question. *Contra* Filing 48 at 6 (arguing that Defendants have asked the wrong question by framing it as whether the government has a "general interest" in stemming the spread of COVID-19 and ensuring military readiness and health and safety of airmen").

On the other hand, the Court concludes that many or all of Plaintiffs' arguments purportedly challenging the Air Force's compelling interest are misdirected. They are relevant instead to the question of whether the Defendants can demonstrate that the COVID-19 vaccination mandate "is the least restrictive means of furthering [the Air Force's] compelling interest." *See* 42 U.S.C. § 2000bb-1(b)(2). The Court will consider those arguments in the relevant context.

### b. The Air Force's "Compelling Interest" is Not Undermined by Exemptions

One issue that effectively calls into question the Air Force's "compelling interest" is whether an exemption to the COVID-19 vaccination mandate—whether administrative, medical, or religious—allows service members with that exemption to operate within the Air Force as if the service members were vaccinated. This issue begs the question, how does the Air Force have a compelling interest in preventing COVID-19 from impairing the readiness and health of its forces, including individual service members like Plaintiffs, if the Air Force is allowing unvaccinated people with an exemption—whether religious, medical, or administrative—to operate as if they were vaccinated? The answer is, the Air Force cannot have a compelling interest in preventing COVID-19 from impairing the readiness and health of its forces, including individual service members like Plaintiffs, if it is doing so. There can be no dispute that unvaccinated but exempt service members pose exactly the same threats to readiness and health of the Air Force and individual service members as other unvaccinated service members if those exempt service members are operating as if they were vaccinated.

This issue was only alluded to in Plaintiffs' briefs but was brought to the fore in the testimony at the preliminary injunction hearing. Specifically, during the testimony of Lt. Col. Fondren, in response to the Court's request for clarification of whether Lt. Col. Fondren was unable to return to Offutt Air Force Base from his current posting at Columbus Air Force Base because

38

he was unvaccinated, Lt. Col. Fondren replied that was the case. In the colloquy that followed, Lt. Col. Fondren testified that based on current policy, once a religious accommodation is approved, a service member may proceed to any Permanent Change of Service (PCS) or new location as assigned. When asked whether it was his understanding that if a service member received a religious accommodation, the service member could operate as if he or she were vaccinated, Lt. Col. Fondren answered that was his understanding.  He added that the Air Force put a code into the immunization records system and the service member was then cleared to do all the things he or she would normally do as though he or she were vaccinated.  When the Court asked if it was correct that as long as an exemption is given for whatever reason the service member would be able to do whatever it is he or she could do if the service member were vaccinated, Lt. Col. Fondren responded that there are thousands of service members with medical and administrative exemptions for the COVID-19 vaccine who were allowed to do just that. In response to follow-up questions by Defendants' counsel, Lt. Col. Fondren testified that it was not correct that he would still not be eligible for deployment even if he got an exemption. He added that if a service member had a COVID-19 vaccination exemption in his or her records, that service member could deploy just like a service member who is vaccinated.

During the arguments at the end of the preliminary injunction hearing, in response to a question from the Court about whether a service member with an exemption can do whatever he or she could have done before as if he or she were vaccinated, Plaintiffs' counsel stated his understanding that what Lt. Col. Fondren stated was correct.  The Defendants' counsel maintained the contrary. Recognizing the dispute about what service members can do or cannot do if they have an exemption from the Air Force's COVID-19 vaccination mandate, the Court authorized the parties to file Supplemental Briefs.

With their Supplemental Brief, Plaintiffs provided a December 3, 2021, Memorandum regarding training from General Mark D. Kelly, Commander of the Air Combat Command (ACC). Hrg. Ex. 34, Filing 65-1. In the part to which Plaintiffs direct the Court's attention, Filing 65 at 5, Gen. Mark Kelly states,

> Effective immediately . . . for the continued health and safety of the force, personnel must be fully vaccinated as a prerequisite to attend any ACC formal training course. This restriction applies to unvaccinated personnel awaiting religious or medical exemptions *until the member* is either fully vaccinated against COVID-19, or *receives an approved medical exemption or religious accommodation that authorizes the member to attend formal training*.

Hrg. Ex. 34, Filing 65-1 at 1 (with emphasis as shown by Plaintiffs at Filing 65 at 5). Plaintiffs argue this excerpt indicates that a medical exemption or religious exemption enables the recipient to attend training and, presumably, allows official travel to attend training. Filing 65 at 5.

The Court disagrees. Gen. Mark Kelly referred to "an approved medical or religious accommodation that authorizes the member to attend formal training." Hrg. Ex. 34, Filing 65-1 (emphasis added). Second, as Defendants point out, Filing 66 at 1, AFI 48-110_IP, provides in pertinent part as follows:

> (3) Combatant commanders, in coordination with the appropriate surgeons general or CG–11, establish specific immunization requirements based on a disease threat assessment. *These requirements may differ from standard Service immunization policies for personnel entering their area of responsibility to participate in exercises or other operational missions*. Immunize personnel on official deployment or travel orders in accordance with the specific guidance established by the combatant commander before departure.

AFI 48-110_IP, § 3-2(e)(3) (emphasis added), https://perma.cc/4LZE-3WCD. The statement in Gen. Mark Kelly's Memorandum and AFI 48-110 make clear that the exemption in question is one that expressly "authorizes the member to attend formal training" and is provided by ACC. It is not simply the Air Force's medical or religious exemption.

Next, with their Supplemental Brief, Plaintiffs provided a November 23, 2021, Memorandum from Lieutenant General Brian Kelly. Hrg. Ex. 35, Filing 65-2. In the part to which Plaintiffs direct the Court's attention, Filing 65 at 5, Lt. Gen. Brian Kelly states,

> Airmen who are not fully vaccinated against COVID-19, including those awaiting final decision on a medical exemption or religious accommodation, are restricted from proceeding on existing PCS orders, or selection for future PCS. *This restriction will remain in place until the member is either a) fully vaccinated against COVID-19, or b) receives an approved medical exemption or religious accommodation.*

Hrg. Ex. 35 at 1, Filing 65-2 at 1 (with emphasis as shown by Plaintiffs at Filing 65 at 5). Plaintiffs argue that this Memorandum indicates that an airman who receives a medical or religious exemption is entitled to undertake official travel to complete a PCS. Filing 65 at 5. The Court agrees. The Court notes, however, that this Memorandum does not allow any official travel for any other purpose than to complete a PCS. It is, at best, a limited exception to the rule prohibiting any unvaccinated service member, including a service member with an exemption from the COVID-19 vaccination mandate, from engaging in official travel. *See* Hrg. Ex. 148, Filing 62-10.

In their Supplemental Brief, Defendants point to evidence that service members with exemptions—administrative, medical, or religious—are not treated like vaccinated service members. As to deployment, Defendants point out that a Military Health System website shows that, as of May 10, 2022, all United States Combat Commands (COCOMs) require full vaccination for COVID-19 for deployment. *See* Filing 66 at 1 (citing https://perma.cc/B2Y7-JU23). Furthermore, DoD 1332.45, § 1.2 provides in pertinent part that "[s]ervice members who are considered non-deployable for more than 12 consecutive months will be evaluated for . . . [a] retention determination by their respective Military Departments." https://perma.cc/K5MC-W7GA; Filing 66 at 2 (citing this provision on this website). Deputy Secretary of Defense Hicks's September 24, 2021, Memorandum provides that service members not vaccinated "are limited to

41

mission-critical official travel, both domestic and international." Hrg. Ex. 148, Filing 62-10. The Court finds that, as Defendants argue, this policy bars travel to attend trainings, unless deemed "mission-critical." Filing 66 at 2 n.2. Moreover, these travel and deployment restrictions apply even if a service member is exempt from the COVID-19 vaccination. Hrg. Ex. 103, Filing 38-2 ("[A]ll unvaccinated service members are treated the same for purposes of determining whether they should travel or deploy.").

The Court finds that, contrary to Plaintiffs' contentions, service members with medical, administrative, or religious exemptions to the COVID-19 vaccination mandate do not operate within the Air Force as if they were vaccinated. Thus, the record shows that the Air Force has a compelling interest in preventing COVID-19 from impairing the readiness and health of its forces, including individual service members like Plaintiffs. The record also shows that the Air Force's compelling interest is not undermined by the exemptions to the COVID-19 vaccination mandate. Consequently, Plaintiffs are unlikely to defeat the first prong of Defendants' defense under RFRA § 2000bb-1(b)(1) by showing lack of a "compelling interest." It follows that Plaintiffs do not have the required likelihood of success on their RFRA claim to warrant a preliminary injunction. *See Tumey*, 27 F.4th at 664 (citing *Winter*, 555 U.S. at 20); *Wildhawk Invs.*, 27 F.4th at 593.

### 3. Application of the Mandate to Plaintiffs is in Furtherance of a Compelling Interest

Section 2000bb-1(b) and *Burwell* also require, as another requirement of the statutory defense to a RFRA claim, that Defendants "demonstrate[ ] that application of the burden to the person," that is, the burden of the COVID-19 vaccination mandate, "is in furtherance of a compelling governmental interest," that is, in furtherance of the Air Force's interest in preventing COVID-19 from impairing the readiness and health of its forces, including individual service members like Plaintiffs. 42 U.S.C. § 2000bb-1(b); *Burwell*, 573 U.S. at 695. One of Plaintiffs'

arguments that is relevant here is their contention that it is now well-established fact that COVID-19 vaccinations do not completely prevent people from becoming infected with or transmitting COVID-19. Filing 21 at 29. In other words, they argue that, because the COVID-19 vaccine does not protect service members, it does not further the Air Force's compelling interest in preventing COVID-19 from impairing the readiness and health of its forces, including individual service members like Plaintiffs. Even so, the Court does not find this argument convincing.

This argument ignores Defendants' evidence that it is equally well-established that COVID-19 vaccinations reduce the chances of hospitalization and death of individual service members and the impact those events have on the force's and individuals' readiness and health. Defendants' evidence includes reports that the overwhelming percentage of the service members who have died from COVID-19 were unvaccinated. Hrg. Ex. 111 at 2, Filing 38-11 at 2. Maj. Scott Stanley's declaration includes the following chilling demonstration of the impact of the lack of vaccination on individual service members:

> Between July and November of 2021, non-fully-vaccinated active-duty service members had a 14.6-fold increased risk of being hospitalized when compared to fully vaccinated active-duty service members. In December 2021 unvaccinated adults were 16-times more likely to be hospitalized than vaccinated adults. Furthermore, unvaccinated adults over 50 years of age were 44 times more likely to be hospitalized than individuals who were vaccinated and received a booster dose. Of all active duty personnel hospitalized with COVID-19 since December of 2020 thr[ough] this month, only 0.012% were vaccinated. This amounts to 13 active duty personnel with boosters and breakthrough infections requiring hospitalization – an extremely rare occurrence. And as mentioned previously, of the 95 deaths among uniformed service members, only two had completed a primary series of a COVID-19 vaccine (one with Moderna and one with J&J) and neither had received a booster dose.

Hrg. Ex. 111 at 8, Filing 38-11 at 8. Just as chilling is Col. Tonya Rans's declaration that "[h]ospitalization rates during Omicron dominance in the unvaccinated active duty population were 65 times higher than the hospitalization rate in those fully vaccinated without a booster." Hrg. Ex. 110, Filing 38-10 at 38. This evidence shows the "marginal interest in enforcing the

[governmental] mandate in th[is] case[ ]," that is, the interest in protecting the readiness and health of individual service members. *Burwell*, 573 U.S. at 727.

Plaintiffs assert that Defendants misstate the scientific evidence concerning COVID-19 vaccines, while Plaintiffs contend that they have relied on a "real expert" in the field. Filing 48 at 11–12. The Court concludes that neither contention is true. Indeed, as the Court opined during the preliminary injunction hearing, there are "many, many, many" problems with the testimony of Dr. Peter A. McCullough, Plaintiffs' "expert," which caused the Court to wonder if Plaintiffs' argument would not be better if Dr. McCullough's testimony was not in the case. The Court concludes that Dr. McCullough is hardly a "real expert" in the field. This Court concurs in another court's conclusion that Dr. McCullough's opinions lie "outside the scientific mainstream." *Navy Seal 1*, 2022 WL 1294486, at *11. This is still true, even if he has now been called to testify or participate in various Congressional and state legislative proceedings, as he now states in his declaration. *See* Hrg. Ex. 12 at 2, 6, Filing 48-2 at 2, 6. This Court concurs in that court's ultimate assessment of the value of Dr. McCullough's testimony:

> [A] battery of medical authorities contest Dr. McCullough's positions. As such, the Court is not inclined to conclude at this early stage of the case that the military's scientific and medical conclusions, which rest on the great weight of scientific authority, should be rejected.

*Navy Seal 1*, 2022 WL 1294486 at *11. Just as importantly, Defendants have identified the scientific and evidentiary basis for their evidence on the impact of COVID-19 vaccination on individual and group health, and that evidence is in line with the great weight of scientific authority. *See, e.g.*, Hrg. Ex. 110 at 31–38, Filing 38-10 at 31–38.

*4. Summary*

None of the arguments that Plaintiffs have offered demonstrates that they have any likelihood of defeating the first prong of Defendants' statutory defense under § 2000bb-1(b). It

follows that Plaintiffs lack the required likelihood of success on their RFRA claim to warrant a preliminary injunction. *See Tumey*, 27 F.4th at 664 (citing *Winter*, 555 U.S. at 20); *Wildhawk Invs.*, 27 F.4th at 593.

### C. The Air Force's COVID-19 Vaccination Mandate is the Least Restrictive Means

The Court now turns to the second prong of Defendants' statutory defense to Plaintiffs' RFRA claim. Section 2000bb-1(b) and *Burwell* require that Defendants also demonstrate that the means the Air Force has selected to further its compelling interest is the "least restrictive means," not just at the Force level, but "to the person." 42 U.S.C. § 2000bb-1(b)(2); *Burwell*, 573 U.S. at 695. Plaintiffs also challenge Defendants showing on this prong of the RFRA defense.

*1. The "Least Restrictive Means" Analysis Under RFRA*

"As with the compelling interest test, RFRA 'requir[es] the Government to demonstrate that application of a substantial burden to the person . . . is the least restrictive means of furthering [that] compelling governmental interest.'" *United States v. Anderson*, 854 F.3d 1033, 1036–37 (8th Cir. 2017) (quoting *Burwell*, 573 U.S. at 705). As the Supreme Court has explained, again in the context of RFRA's sister statute, RLUIPA,

> "The least-restrictive-means standard is exceptionally demanding," and it requires the government to "sho[w] that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting part[y]." *Hobby Lobby, supra*, at 728, 134 S.Ct., at 2780. "[I]f a less restrictive means is available for the Government to achieve its goals, the Government must use it." *United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803, 815, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000).

*Holt v. Hobbs*, 574 U.S. 352, 364–65 (2015). It appears that the analysis involves comparing the efficacies and risks of available alternatives, as applied to a particular Plaintiff, with the efficacies and risks of the chosen means. *Id.* at 365 (considering the risks and efficacy of searching a

petitioner's beard as a way to control the flow of contraband in a prison as compared to subjecting the petitioner to a complete ban on beards).

   2. *Plaintiffs' Allegedly "Less Restrictive Means" are Inadequate*

Plaintiffs argue that there are several less restrictive means to further the Air Force's compelling interest in preventing COVID-19 from impairing the readiness and health of its forces, including individual service members like Plaintiffs, besides denying their RARs and compelling them to undergo vaccination. Filing 21 at 32. First, they point to the combination of various other measures, such as regular testing, social distancing, and masking, as more than sufficient to accomplish the goal of slowing the spread of COVID-19. Filing 21 at 32–33. They argue that Defendants cannot show that all these less restrictive alternatives are impossible, as they must to satisfy this inquiry. Filing 21 at 33. Second, they contend that natural immunity is a less restrictive means of accomplishing the compelling goal, and it could be accomplished simply by testing airmen for antibodies to ensure that their natural immunity remains robust. Filing 21 at 33. Plaintiffs point out that the Air Force has recognized natural immunity as sufficient to protect against diseases in the past, but the Air Force has taken a different position with COVID-19. Filing 21 at 34.

Defendants respond that caselaw from the nonmilitary context, scientific evidence, and military judgment all concur that vaccination is the least restrictive means of controlling COVID-19. Filing 42 at 29–30. Defendants assert that the scientific evidence the Air Force reviewed demonstrates why masks, Filing 42 at 30-31, testing, Filing 42 at 31–32, and immunity, Filing 42 at 25, are less effective than vaccination.

In reply, Plaintiffs assert that Defendants have not shown they considered the least restrictive means as to each airman's situation. Filing 48 at 16. They also assert, without citation to any evidence, that an unvaccinated airman who has just tested negative for COVID-19 poses

far less of a threat of spreading the virus than a vaccinated airman who has not taken a test. Filing 48 at 18. Plaintiffs also assert that Defendants rely on unqualified declarants to suggest that natural immunity is not as effective as vaccination, but their expert has opined that natural immunity is actually superior to any immunity conveyed by a COVID-19 vaccine. Filing 48 at 19.

Plaintiffs do not argue that either masking alone or social distancing alone is a less restrictive but more effective means of furthering the Air Force's compelling interest in preventing COVID-19 from impairing the readiness and health of its forces, including individual service members like Plaintiffs. They argue that masking and social distancing in combination with testing would be less restrictive but equally or more effective. Filing 21 at 32. It should be obvious that masks and social distancing provide no protection to a service member who is infected with COVID-19, but COVID-19 vaccination does. Hrg. Ex. 109 at 8, Filing 38-9 at 8 (Col. Poel's declaration); Hrg. Ex. 111 at 2, 8, Filing 38-11 at 2, 8 (Maj. Stanley's declaration); Hrg. Ex. 110, Filing 38-10 at 38 (Col. Rans's declaration).

To a substantial extent, Plaintiffs' arguments concerning "least restrictive means" rely on Dr. McCullough's views on what methods are more efficacious than COVID-19 vaccination in controlling the spread of COVID-19. The Court explained above, in Section II.B.3., beginning on page 44, that Dr. McCullough's opinions are outliers not supported by the greater weight of the scientific authority and contrary to the scientific authority Defendants' declarants have relied on.

Dr. McCullough is board certified in internal medicine and cardiovascular diseases. Hrg. Ex. 12 at 1, Filing 48 at 1. As another district court addressing a similar case observed, "Dr. McCullough has a master's degree in public health (with a focus on epidemiology), but his practice was almost entirely internal medicine and clinical cardiology until he began publishing on COVID-19 in the early days of the pandemic." *Navy SEAL 1 v. Austin*, No. CV 22-0688 (CKK),

2022 WL 1294486, at *11 (D.D.C. Apr. 29, 2022). Not only is it doubtful that Dr. McCullough's

credentials demonstrate he is an expert on COVID-19, Dr. McCullough makes several claims that

are outside the conclusions of the mainstream of the vast scientific studies of the COVID-19 virus

and COVID-19 vaccination.

> For example, Dr. McCullough opines,

> Although the tests available for COVID-19 are not perfect, they are accurate as
> diagnostic aids in patients who are acutely ill with suspected COVID-19. A regime
> of testing symptomatic airmen and isolating those who test positive would do far
> more than the current vaccine mandate to slow the transmission of COVID-19
> among airmen.

Hrg. Ex. 12 at 5, Filing 48-2 at 5. The problem with this statement is, as Dr. McCullough notes,

that testing is "accurate as a diagnostic aid in patients who are acutely ill with suspected COVID-

19." The Air Force's compelling interest is not just in discovering which service members already

have COVID-19. Rather, the Air Force's compelling interest is in preventing COVID-19 in the

first place. The Air Force states it needs to demand vaccination in order to preserve the readiness

and health of its forces, including individual service members like Plaintiffs. Also,

Dr. McCullough cites no studies or other authority supporting this opinion, so that it is nothing

more than *ipse dixit*.

> In contrast, Colonel James R. Poel, Chief of Public Health at the Air Force Medical

Readiness Agency (AFMRA), identified in his declaration extensive authorities considering the

efficacy of testing on both asymptomatic and symptomatic individuals over time to identify

individuals with COVID-19 infections. Hrg. Ex. 109 at 9-10, Filing 38-9 at 9–10. Col. Poel

explained that "detection may not be prior to infectivity," that is, before an infected individual can

infect others, and "[o]n the day of peak infectivity viral detection is only 90%." Hrg. Ex. 109 at

10, Filing 39-9 at 10. Col. Poel summarized the scientific evidence on testing as follows:

> Overall, serial antigen testing of asymptomatic members will detect most infections, but the member will likely be infectious prior to the test becoming positive. Serial testing will curtail the exposure in the unit after the infection is detected, but this is not as effective as preventing the original infection.
>
> Additionally, testing can only identify the virus and does not prevent the Service member from becoming infected in the first place.

Hrg. Ex. 109 at 10, Filing 38-9 at 10. In light of the Air Force's scientific evidence, the Court cannot conclude that testing is a less restrictive but equally effective means compared to vaccination for furthering the Air Force's compelling interest in preventing COVID-19 from impairing the readiness and health of its forces, including individual service members like Plaintiffs.

> Dr. McCullough also claims,
>
> At this time, we can say with confidence that the COVID-19 vaccinations do not reduce the chances that a person will contract COVID-19 resulting in serious outcomes such as hospitalization or death. The US FDA has not granted any of the vaccine manufacturers a claim from randomized trials that any of the COVID-19 vaccines reduce the risk of hospitalization and death. This is particularly true regarding the Omicron variant and subsequent variants, which are not slowed or impeded in any way by the vaccines.

Hrg. Ex. 112 at 2, Filing 48 at 2.  Dr. McCullough states this even though hospital data and the data in this case proves that unvaccinated service members are dramatically more likely to end up in the hospital and/or die from COVID-19 than vaccinated service members. This fact is demonstrated by Maj. Stanley's and Col. Rans's chilling declarations on these matters mentioned above. Hrg. Ex. 111 at 2, 8, Filing 38-11 at 2, 8 (Maj. Stanley's declaration); Hrg. Ex. 110, Filing 38-10 at 38 (Col. Rans's declaration). The Court concludes that the scientific data in front of this Court for the purposes of this motion does not support Dr. McCullough's contentions on this point.

Dr. McCullough also opines, "Three studies have demonstrated that when COVID-19 recovered patients are either advised or mandated to take a COVID-19 vaccination, they suffer

unacceptably high side-effects including hospitalization." Hrg. Ex. 12 at 5, Filing 48-2 at 5. On

the other hand, Col. Rans points out,

> The CDC states that "COVID-19 vaccination is recommended for everyone aged 5
> years and older, regardless of a history of symptomatic or asymptomatic SARS-
> CoV-2 infection. This includes people with prolonged post-COVID-19 symptoms
> and applies to primary series doses and booster doses. This recommendation also
> applies to people who experience SARS-CoV-2 infection before or after receiving
> any COVID-19 dose… Current evidence demonstrates a robust immune response
> to vaccination after infection, but information is lacking about whether and how the
> amount of time since infection affects the immune response to vaccination.
> Growing epidemiologic evidence from adults and adolescents indicates that
> vaccination following infection further increases protection from subsequent
> infection, including in the setting of increased circulation of more infectious
> variants. Viral testing to assess for acute SARS-CoV-2 infection or serologic testing
> to assess for prior infection is not recommended for the purpose of vaccine
> decision-making."

Hrg. Ex. 110 at 23, Filing 38-10 at 23.[17] Furthermore, it is difficult for the Court to accept that

high side effects in patients who have recovered from COVID-19 are caused by a subsequent

COVID-19 vaccination rather than by the prior COVID-19 infection itself. As Col. Rans points

out, "A further study of multiple health care systems across the United Sta[t]es found that the

incidences of cardiac complications after SARS-CoV-2 infection or mRNA COVID-19

vaccination were low overall but were significantly higher after infection than after vaccination

for both males and females in all age groups." Hrg. Ex. 110 at 8, Filing 38-10 at 8.[18] Again,

Dr. McCullough's opinion on this issue is both based on limited evidence and an outlier.

Finally, Dr. McCullough opines that "[n]atural immunity acquired by contracting and

recovering from COVID-19 is superior to any immunity that might be conveyed by a COVID-19

vaccine" and that "[n]atural immunity is durable, robust, and substantially complete in giving

---

[17]   Col.   Rans   cites   https://www.cdc.gov/vaccines/covid-19/clinical-considerations/covid-19-vaccines-
us.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fvaccines%2Fcovid-19%2Finfoby-
product%2Fclinical-considerations.html.
[18] Col. Rans cites Block JP, et al. Cardiac Complications After SARS-CoV-2 Infection and mRNA COVID-19
Vaccination   –   PCORnet,   United   States,   January   2021-January   2022
https://www.cdc.gov/mmwr/volumes/71/wr/pdfs/mm7114e1-H.pdf.

protection against subsequent infection with SARS-CoV-2 leading to serious outcomes such as hospitalization or death." Hrg. Ex. 12 at 4, Filing 48-2 at 12. Again, the Air Force's scientific evidence is strongly to the contrary as demonstrated by Col. Poel's declaration:

> Although COVID-19 disease does provide some degree of natural immunity to SARS-CoV-2 virus, the length and completeness of protection varies. Current evidence has not determined an antibody threshold indicative of protection from re-infection. Nor is there an FDA-authorized or FDA-approved test to assess this. Evidence is also inadequate to associate specific antibody levels with the degree of re-infection risk for an individual.

Hrg. Ex. 109 at 11, Filing 38-9 at 11.[19] In addition, Col. Poel declares,

> One to ten percent of people do not develop long-lasting (IgG-type) antibodies following confirmed COVID-19 infection (vs. 100% developing antibodies for the mRNA vaccines and 90% for Johnson & Johnson/Janssen). Antibody titers, a measurement of the amount of antibody in a person's blood, peak at 3 to 5 weeks after infection and then begin to wane. Neutralizing antibodies, or antibodies which eliminate a pathogen before an infection takes place, demonstrate approximately a 50% reduction within 2 to 3 months and become undetectable in up to 30% of people within 10 months post-infection. Mild or asymptomatic COVID-19 infections tend to generate lower antibody levels than those with severe disease. Overall, the duration of protection varies depending on disease severity, person's age, antibody assay utilized, and variants of the virus. After infections with the original SARS-CoV-2 strain, detectable neutralizing antibodies were found in 84% of people for the Alpha variant, 68% for the Delta variant, and 55% for the Beta variant.

Hrg. Ex. 109 at 11–12, Filing 38-9 at 11–12 (footnotes omitted).[20] The Court acknowledges that it is possible that scientific support might exist (or be available in the future) that those individuals with a certain level of natural immunity may have immunity sufficient to prevent the need for a vaccination. Nevertheless, in light of Col. Poel's evidence, the Court cannot in good conscious rely upon Dr. McCullough to conclude that natural immunity is superior to COVID-19 vaccination in furthering the Air Force's compelling interest.

---

[19] Col. Poel cites CDC, Science Brief: SARS-CoV-2 Infection-Induced and Vaccine-Induced Immunity (Oct. 29, 2021), https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/vaccine-induced-immunity.html.

[20] The Court will not set out here each of the authorities on which Col. Poel relied in this statement. The Court points out, however, that all are authoritative publications of the World Health Organization, the CDC, or peer-reviewed journals.

Thus, Dr. McCullough's testimony does nothing to undermine Defendants' contention that vaccination is the least restrictive means the Air Force can use to prevent COVID-19 from impairing the readiness and health of its forces, including individual service members like Plaintiffs. The Court concludes that the weight of the scientific evidence supports the conclusion that COVID-19 vaccination is the least restrictive means to protect both the Air Force's goals of readiness and health generally and to protect individual service members' readiness and health specifically. This is so, among other reasons, because it is the only measure that lessens the severity and duration of the disease, even if infection occurs. Hrg. Ex. 111 at 2, Filing 38-11 at 2; *see also Navy Seal 1*, 2022 WL 1294486, at *10. This is so, even if vaccination is not the only means that *might* prevent an individual from contracting or transmitting the virus.

Another issue this Court finds is worthy of some brief discussion is the nature of the COVID-19 virus. Evidence in the record illustrates that vaccinations have worked better for previous variants of the virus, but vaccinations are somewhat less effective for the currently dominant Omicron variant. *See, e.g.,* Hrg. Ex. 109 at 5–6, Filing 38-9 at 5–6 (citing studies reaching these conclusions). However, Omicron is significantly less deadly than prior variants, particularly for those who were previously vaccinated. *See, e.g.,* Hrg. Ex. 109 at 6, Filing 38-9 at 6 (citing scientific authority for this conclusion and explaining, "In summary, a fully vaccinated service member is less likely to contract COVID-19 than an unvaccinated Service member and, if infected, is more likely to recover quicker and get back to the fight, minimizing the impact to mission accomplishment.").

The evolution of the virus over time supports the Air Force's contention that vaccination is the least restrictive means to accomplish its compelling interest. Even if the Air Force and the public are today facing a dominant variant where current vaccines are somewhat less effective,

this may not be the case for the next variant of the disease. Indeed, there is little question that the prevalence and willingness of members of the public in taking existing vaccines greatly reduced serious illness and hospitalizations during the course of the pandemic, particularly during the Delta variant. If we are so unlucky that another variant is more deadly, the Air Force has an interest in having its force be in the best position for military readiness by submitting to vaccination.

A final contention that is worthy of discussion is the argument that since 96.8% of Air Force personnel followed their orders and are fully vaccinated against COVID-19 (and another 0.1% are partially vaccinated),[21] that should be enough. Forcing the final 3.2% to submit is not necessary, and therefore is not the least restrictive means, for the Air Force to further its compelling interest. This is essentially what Plaintiffs argue when they contend that Defendants do not have a compelling interest because the marginal impact of denial of individual RARs amounts to nothing more than eking out another fraction of a percentage point of service members in compliance with the vaccination mandate. Filing 21 at 29 (asserting this argument as to "compelling interest"). Defendants respond that each Plaintiff's refusal to immunize threatens that member's health and increases the rate of transmission to other service members. Filing 42 at 24. Defendants also argue that immunity, even of large numbers of service members, is not as effective as vaccination in protecting individual members from infection, preventing the spread of the disease, or combatting the disease and the increased severity of infections in unvaccinated members. Filing 42 at 25–26.

There is little doubt that if the public had agreed to become vaccinated at the rate that members of the U.S. Air Force had submitted, the pandemic, and indeed the death toll, could have been dramatically different. However, the question this Court must consider is whether the willingness of the vast majority of the Air Force to get the vaccine results in vaccination not being

---

[21] https://www.af.mi/News/Article-Display/Article/2989918/daf-covid-19-statistics-apr-26-2022/.

the least restrictive means for the Air Force to further its compelling interest. The Court concludes the "everyone else did it so I don't have to" argument fails. That is because the trustworthy scientific evidence in the record so far establishes that COVID-19 vaccinations reduce the chances of hospitalization and death of individual service members and the impact those events have on the force's and individuals' readiness and health. Hrg. Ex. 111 at 2, 8, Filing 38-11 at 2, 8; *see also* Hrg. Ex. 110, Filing 38-10 at 38 (declaring that "[h]ospitalization rates during Omicron dominance in the unvaccinated active duty population were 65 times higher than the hospitalization rate in those fully vaccinated without a booster"). Defendants' evidence includes reports that the overwhelming percentage of the service members who have died from COVID-19 were unvaccinated. Hrg. Ex. 111 at 2, Filing 38-11 at 2.

The Court concludes that Defendants have shown that the Air Force's vaccination mandate is the least restrictive means of achieving its compelling interests. The Court further finds that none of the contrary arguments Plaintiffs specifically aimed at defeating "least restrictive means" is persuasive. Consequently, Plaintiffs have no likelihood of defeating the second prong of Defendants' statutory defense under § 2000bb-1(b). It follows that Plaintiffs have not shown the required likelihood of success on their RFRA claim to warrant a preliminary injunction. *See Tumey*, 27 F.4th at 664 (citing *Winter*, 555 U.S. at 20); *Wildhawk Invs.*, 27 F.4th at 593.

### 3. Plaintiffs' Misplaced Challenges to "Compelling Interest" are Not Persuasive as to "Least Restrictive Means"

The Court opined above, in Section III.B.2.a., that the problem with most, if not all, of Plaintiffs' challenges to the Air Force's "compelling interest" is that they confuse the Air Force's "compelling interest" with whether the Air Force's chosen means is "the least restrictive means" to further its "compelling interest." *See* 42 U.S.C. § 2000bb-1(b)(2) (requiring a demonstration that the Government's action "is the least restrictive means of furthering that compelling

54

governmental interest"). The Court will consider those challenges now, in what the Court believes is their proper context.

Plaintiffs argue that the Air Force has deployed multiple Plaintiffs, which shows that universal vaccination is not necessary to serve the Air Force's interest in military readiness. Filing 21 at 27. Defendants argue that the fact that it has found ways to perform its duties despite the risks of COVID-19 does not mean it must endure such risks indefinitely when there are effective means of mitigating them. Filing 42 at 28-19. Plaintiffs respond that this argument is inapposite. Filing 48 at 13. On this point, this Court agrees with the court in *Short v. Berger*:

> [M]erely because the military has found ways to perform its duties despite the risks of COVID-19 does not mean it must endure these risks indefinitely when there are effective means of mitigating them. Like many millions of other essential workers, the military has heroically and with great ingenuity found ways to persevere during an unprecedented deadly pandemic. But that does not mean that the military is not entitled to use the most effective means available to end its crisis footing and return to a semblance of normalcy.

*Short*, 2022 WL 1051852, at *9. The Air Force simply was not required to continue to "muddle through" with less effective means once superior means of furthering its compelling interest, in the form of FDA-approved vaccines, were available. To the extent that any deployments of unvaccinated service members began after the Air Force imposed its COVID-19 vaccination mandate, there is no evidence that those deployments were anything but rare. There is also no evidence that they were not authorized by the command authorities as exceptions to the COVID-19 vaccination mandate that were deemed necessary to specific mission fulfillment.

Indeed, the fact that the Air Force is not required to endure risks from using only the means available prior to the advent of FDA-approved COVID-19 vaccines answers Plaintiffs' argument that the Air Force's own delay in establishing the COVID-19 vaccination mandate is not the "least restrictive means." Filing 21 at 31 (framing this argument as a challenge to "compelling interest"). Defendants reject the notion that a "delayed implementation" undercuts the conclusion that the

55

vaccination mandate is the "least restrictive means," because the military has no deadlines on actions to improve effectiveness and readiness. Filing 42 at 29. The Court agrees with Defendants. It seems ill-advised to the Court to hold that the military cannot wait to impose a vaccination mandate until the FDA has provided full approval of the vaccine in question. *See* Hrg. Ex. 146 at 1, Filing 1-1 at 2 (imposing the military's COVID-19 vaccination mandate as soon as FDA-approved vaccines were available). There was a possibility that premature action could do more harm than good. Moreover, nothing about the delay detracts from the efficacy of the COVID-19 vaccination mandate once fully approved vaccines became available. Finally, nothing about delay detracts from the efficacy of the vaccination mandate as the least restrictive means available at the time it was imposed and as circumstances stand now.

Thus, neither the prior use of other means nor the purported delay in invoking a COVID-19 vaccination mandate is a reason that the Air Force's COVID-19 vaccination mandate is not the "least restrictive means" of furthering its compelling interest. The Court concludes that, at least on this record, Defendants have shown that the COVID-19 vaccination mandate is the "least restrictive means" to address its compelling interest. The Court also concludes that none of Plaintiffs' reasons for asserting vaccination is not the "least restrictive means" is even marginally persuasive. These conclusions demonstrate Plaintiffs do not have the required likelihood of success on the merits to warrant a preliminary injunction. *See Tumey*, 27 F.4th at 664 (citing *Winter*, 555 U.S. at 20); *Wildhawk Invs.*, 27 F.4th at 593.

### D. Summary

The Court concludes that the record thus far supports both prongs of Defendants' statutory defense to a RFRA claim. Somewhat more specifically the record shows that the Air Force's COVID-19 vaccination mandate, which burdens Plaintiffs' religious exercise, (1) is in furtherance of a compelling interest in preventing COVID-19 from impairing the readiness and health of its

forces, including individual service members like Plaintiffs, and (2) is the least restrictive means of furthering that compelling governmental interest. 42 U.S.C. § 2000bb-1. Plaintiffs have not presented evidence or argument that undermines that conclusion. Thus, they do not have a likelihood of success on their RFRA claim, and no preliminary injunction is warranted.

### IV. THE REMAINING *WINTER* FACTORS DO NOT TIP THE BALANCE IN FAVOR OF A PRELIMINARY INJUNCTION

Although "likelihood of success" is "the most significant" of the *Winter* factors, *Tumey*, 27 F.4th at 665 (internal quotation marks and citation omitted), the Court will nevertheless consider the remaining *Winter* factors. The Court concludes, however, that these remaining factors do not warrant the issuance of a preliminary injunction in this case.

### A. Plaintiffs Have Not Shown Irreparable Harm

The next *Winter* factor is whether it is likely that Plaintiffs will suffer irreparable harm in the absence of preliminary relief. *Tumey*, 27 F.4th at 664. The movant must show that "irreparable injury is *likely* in the absence of an injunction, not merely a 'possibility' of irreparable harm before a decision on the merits can be rendered." *Id.* at 664–65 (emphasis in the original) (quoting *Winter*, 555 U.S. at 20). "The failure of a movant to show irreparable harm is an 'independently sufficient basis upon which to deny a preliminary injunction.'" *Sessler v. City of Davenport*, 990 F.3d 1150, 1156 (8th Cir. 2021) (quoting *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003)).

Here, Plaintiffs allege various kinds of economic loss to them that is or will be caused by enforcement of the Air Force's COVID-19 vaccination mandate. "'Economic loss, on its own, is not an irreparable injury so long as the losses can be recovered'"—*i.e.*, can be recompensed by money damages. *Wildhawk Invs., LLC*, 27 F.4th at 597 (quoting *DISH Network Serv. L.L.C. v. Laducer*, 725 F.3d 877, 882 (8th Cir. 2013)). Thus, the Court doubts that such harms are "irreparable," even in the RFRA context. Indeed, courts considering the irreparable harm factor in

essentially the same context the Court does now have held that discharge would likely not be irreparable harm because the service members would be entitled to reinstatement and back pay should they ultimately succeed on the merits. *Navy SEAL 1 v. Austin*, No. CV 22-0688 (CKK), 2022 WL 1294486, at *4 (D.D.C. Apr. 29, 2022); *Doster v. Kendall*, No. 1:22-CV-84, 2022 WL 982299, at *15 (S.D. Ohio Mar. 31, 2022); *Poffenbarger v. Kendall*, No. 3:22-cv-1, 2022 WL 594810, at *18 (S.D. Ohio Feb. 28, 2022).

One of those courts expressed doubt that the plaintiff could show irreparable harm, because the Navy's COVID-19 vaccination mandate did not literally deprive him of the freedom to exercise his religion. *Navy SEAL 1*, 2022 WL 1294486, at *16. That court found that "no government actor was preventing the plaintiff from exercising his alleged religious conviction against COVID-19 vaccination, where "[p]laintiff remains free to depart the military, and if [p]laintiff attends religious services, he remains free to do so." *Id.* This Court does not find this rationale persuasive in light of other authorities.

For example, in the context of whether to stay a preliminary injunction on the Navy's COVID-19 vaccination mandate based on an RFRA claim, the Fifth Circuit Court of Appeals stated,

> "The loss of First Amendment freedoms, for even minimal periods of time unquestionably constitutes irreparable injury." *Opulent Life Church v. City of Holly Springs Miss.*, 697 F.3d 279, 295 (5th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373, 96 S. Ct. 2673, 2690, 49 L.Ed.2d 547 (1976) (plurality opinion)). "This principle applies with equal force to the violation of [RFRA] rights because [RFRA] enforces First Amendment freedoms, and the statute requires courts to construe it broadly to protect religious exercise." *Id.* (citations omitted). At base, Plaintiffs are staring down even more than "a choice between their job(s) and their jab(s)." *BST Holdings, L.L.C. v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021). By pitting their consciences against their livelihoods, the vaccine requirements would crush Plaintiffs' free exercise of religion.

*U.S. Navy Seals 1-26 v. Biden*, 27 F.4th 336, 348 (5th Cir. 2022), *stayed in part sub nom. Austin v. U. S. Navy Seals 1-26*, 142 S.Ct. 1301 (2022); *but see Short v. Berger*, No. CV-22-00444-PHX-

*DJH*, 2022 WL 1203876, at \*2 (D. Ariz. Apr. 22, 2022) (expressing doubt that a military plaintiff's

"asserted injury—the coercion inherent in being forced to choose between following his religious

beliefs and a military order—qualifies as an irreparable injury under Ninth Circuit law.").

Similarly, one of the district courts considering a similar situation addressed this issue as

follows:

> Yet, even if the harm is fully compensable by monetary damages, the Sixth Circuit has previously found that violations of the First Amendment and RFRA rights satisfy the irreparable harm requirement. *Maryville Baptist Church, Inc*., 957 F.3d at 615-16 (finding restriction that burdened religion "assuredly inflicts irreparable harm"); *Autocam Corp. v. Sebelius*, 730 F.3d 618 (6th Cir. 2013) (same). Unquestionably, the loss of First Amendment freedoms, for even minimal periods of time, "constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). "This principle also applies to violation of rights under the RFRA." *Poffenbarger*, —— F.Supp.3d at ——, 2022 WL 594810 at \*19.
>
> Additionally, Courts with similar issues presented to them in the past few months have determined that "the substantial pressure on a religious objecting service member to obey the COVID-19 vaccination order and violate a sincerely held religious belief constitutes an irreparable injury redressable by a preliminary injunction." *Navy Seal 1 v. Austin*, No. 8:21-cv-2429, —— F.Supp.3d ——, ——, 2022 WL 534459, at \*19 (M.D. Fla. Feb. 18, 2022); *see also Air Force Officer v. Austin*, 2022 WL 468030 at \*12 (M.D.Ga. Feb. 15, 2022) (finding that the plaintiff established irreparable injury because her religious exemption request was denied by the Air Force and such denial "essentially infringed upon the free exercise of her religion"); *U.S. Navy Seals 1-26*, —— F.Supp.3d at ——, 2022 WL 34443 at \*3 ("But because these injuries are inextricably intertwined with Plaintiffs' loss of constitutional rights, this Court must conclude that Plaintiffs have suffered irreparable harm").

*Doster v. Kendall*, No. 1:22-CV-84, 2022 WL 982299, at \*16 (S.D. Ohio Mar. 31, 2022). That

court concluded that because the plaintiffs had established a likelihood of success on the merits

for their RFRA and Free Exercise Clause claims, they had also established irreparable harm. *Id.*

This Court agrees that the "coercion" of choosing between the exercise of religious rights

and one's employment, if caused by a RFRA violation or a likely RFRA violation, would constitute

an irreparable harm. However, in this case, this Court has concluded above that Plaintiffs are not

likely to succeed on the merits of their RFRA claim. This deficiency causes the Plaintiffs to be unable to demonstrate irreparable harm. This factor therefore weighs against the issuance of a preliminary injunction. *Sessler*, 990 F.3d at 1156.

### B. The Balance of Equities and the Public Interest Do Not Weigh in Favor of a Preliminary Injunction

The third *Winter* factor is whether the balance of equities tips in the movant's favor, and the fourth and last *Winter* factor is whether an injunction is in the public interest. *Tumey*, 27 F.4th at 664. Courts considering similar requests for a preliminary injunction against a military COVID-19 vaccination mandate generally agree that "[w]here . . . the government is a party to the litigation, these two factors merge and are 'one and the same, because the government's interest is the public's interest.'" *See Creaghan v. Austin*, No. CV 21-0981 (CKK), 2022 WL 1500544, at *11 (D.D.C. May 12, 2022) (quoting *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016)); *Navy SEAL 1 v. Austin*, No. CV 22-0688 (CKK), 2022 WL 1294486, at *16 (D.D.C. Apr. 29, 2022); *Short v. Berger*, No. CV-22-00444-PHX-DJH, 2022 WL 1203876, at *6 (D. Ariz. Apr. 22, 2022) (citing *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014)); *Doster v. Kendall*, No. 1:22-CV-84, 2022 WL 982299, at *11 (S.D. Ohio Mar. 31, 2022) (citing, *inter alia*, *Wilson v. Williams*, 961 F.3d 829, 845 (6th Cir. 2020)); *U.S. Navy SEALs 1-26 v. Austin*, No. 4:21-CV-01236-O, 2022 WL 1025144, at *13 (N.D. Tex. Mar. 28, 2022) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

In this case, for essentially the same reasons that the first two *Winter* factors weigh against a preliminary injunction, the balance of equities and the public's interest also weigh against a preliminary injunction. Specifically, the Air Force's interest in preventing COVID-19 from impairing the readiness and health of its forces, including individual service members like Plaintiffs, is in the public interest. That interest outweighs any countervailing interest of Plaintiffs.

## V.  CONCLUSION

Plaintiffs lack the required "likelihood of success" on their RFRA claim to warrant a preliminary injunction. Moreover, because Plaintiffs are not likely to succeed on their RFRA claim, they are likewise not likely to succeed on their First Amendment Free Exercise claim. *See, e.g., New Doe Child #1 v. United States*, 901 F.3d 1015, 1025 (8th Cir. 2018) ("By its terms, RFRA offers greater protection than the Free Exercise Clause."). The additional *Winter* factors do not change the outcome in this case. A preliminary injunction is not warranted. Under these circumstances,

IT IS ORDERED that Plaintiffs' March 18, 2022, Motion for Preliminary Injunction, Filing 20, is denied.

Dated this 18th day of May, 2022.


BY THE COURT:

_____

Brian C. Buescher
United States District Judge

61